## State of Vermont v. Vicki Boyea

[765 A.2d 862]

No. 99-061

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed December 1, 2000

*Paul Finnerty,* Washington County Deputy State's Attorney, Barre, for Plaintiff-Appellee.

*Robert Appel,* Defender General, and *Henry Hinton,* Appellate Attorney, Montpelier, for Defendant-Appellant.

**Morse, J.** To appreciate the realities underlying today's decision, consider the following alternative scenarios based upon the record evidence. Having received a State Police radio dispatch — derived from an unnamed informant — reporting a specifically described vehicle with New York plates traveling in a certain direction on I-89 operating "erratically," a police officer locates the car, observes it exit the highway, and pulls out in pursuit. The officer catches up with the vehicle within minutes, but then faces a difficult decision. He could, as

the officer here, stop the vehicle as soon as possible, thereby revealing a driver with a blood alcohol level nearly three times the legal limit and a prior DUI conviction. Or, in the alternative, he could follow the vehicle for some period of time to corroborate the report of erratic driving. This could lead to one of several endings. The vehicle could continue without incident for several miles, leading the officer to abandon the surveillance. The vehicle could drift erratically — though harmlessly — onto the shoulder, providing the corroboration that the officer was seeking for an investigative detention. Or, finally, the vehicle could veer precipitously into oncoming traffic, causing an accident.

These are not improbable scenarios. Sooner or later, depending upon the outcome of this case, one or all of them could occur. The dissenting Justices would hold that the constitutional right to privacy leaves the officer no choice but to wait, at whatever risk to the driver and the public. We are not persuaded that the Constitution compels this result. Rather, an anonymous report of erratic driving must be evaluated in light of the imminent risks that a drunk driver poses to himself and the public. We hold that, on the facts of this case, the officer's expeditious stop of the vehicle was based upon sufficiently reliable information, notwithstanding the absence of any personal observation of incriminating behavior by the driver. Accordingly, we affirm.

The undisputed facts were as follows. On July 18, 1998, at approximately 3:00 p.m., a Vermont state trooper received a radio dispatch of a "blue-purple Volkswagen Jetta with New York plates, traveling south on I-89 in between Exits 10 and 11, operating erratically." The officer, who was patrolling nearby, parked his cruiser in the median just north of Exit 10 to wait for the vehicle. Within five minutes, the officer spotted a purple Volkswagen Jetta with New York plates traveling south on I-89. The officer observed the vehicle turn off the interstate at Exit 10, and immediately pulled out to follow. The officer lost sight of the vehicle after it exited, but regained visual contact as it turned onto Route 2, and caught up with it shortly thereafter. The officer activated his blue lights, and the vehicle pulled over. Based upon his subsequent observations, the officer arrested defendant for DUI. The trial court denied a motion to suppress, and defendant entered a conditional plea of guilty to DUI, second offense. This appeal followed.

Defendant contends that, because nothing the officer observed during the mile and a half that he "followed" defendant confirmed the

anonymous report of erratic driving, the officer lacked a reasonable and articulable suspicion to justify the stop. See *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *State v. Crandall*, 162 Vt. 66, 70, 644 A.2d 320, 323 (1994). It is worth observing, at the threshold, that it is inaccurate to suggest the officer here was somehow trailing defendant waiting for her to give some overt sign of intoxication. In fact, the record shows, and the trial court found, that the officer had visual contact with defendant for only a portion of the short time that he pursued her, and that he effectuated the stop immediately after he caught up with her. This was not an officer seeking independent verification that a driver was intoxicated, but rather one intent upon catching and stopping as soon as practically possible a driver whom he already suspected of being under the influence.

It is important to understand these factual nuances to better appreciate the stark legal issue they present. It is an issue which this Court recently considered, albeit indirectly, in *State v. Lamb*, 168 Vt. 194, 720 A.2d 1101 (1998), and which numerous other courts have directly addressed in recent years. May a police officer acting upon an anonymous tip that accurately describes a vehicle, accurately predicts its route and location upon the highway, and indicates that it is behaving in a fashion indicative of drunk driving, reasonably detain the vehicle without personally observing some indicia of intoxication? Or, alternatively, must the officer wait to observe some incriminating behavior, however that might threaten the driver's or the public's safety, before stopping the vehicle to investigate?

Confronted with this precise issue, a majority of courts have concluded that failing to stop a vehicle in these circumstances in order to confirm or dispel the officer's suspicions exposes the public, and the driver, to an unreasonable risk of death or injury. Indeed, we relied upon many of these decisions in *Lamb*, observing that "[t]he potential risk of harm to the defendant and the public is widely acknowledged to be a critical factor in assessing the reasonableness of an investigatory stop." 168 Vt. at 199, 720 A.2d at 1104.[1] After reviewing several cases involving deadly weapons, we concluded that "[t]he principle . . . that the gravity of the risk of harm must be considered in

---

[1] *Lamb* differed in several respects from the case at bar. The caller, although unnamed, was not quite as "anonymous" in the sense that it could reasonably be inferred she was a friend or acquaintance reporting a domestic dispute. 168 Vt. at 198, 720 A.2d at 1103. The investigating officer also knew defendant had been previously arrested for DUI. *Id.* at 198-99, 720 A.2d at 1104.

evaluating the reasonableness of the investigatory stop . . . applies with equal force to intoxicated driving." *Id.* at 200, 720 A.2d at 1105.[2]

We then proceeded to cite with approval a series of cases upholding brief investigative motor-vehicle stops based upon an anonymous tip of erratic or drunk driving. The first decision we discussed was *State v. Melanson*, 665 A.2d 338 (N.H. 1995). There, as here, a police officer received a report from a dispatcher relaying information from an anonymous informant about a vehicle on the highway. The information conveyed "an exact description of the vehicle, the vehicle's current location and direction of travel, and a description of prior erratic driving." *Id.* at 341. Based upon this information, the officer located the vehicle, activated his lights, and stopped the vehicle, resulting in the driver's arrest for DUI. The officer observed no erratic behavior prior to activating his lights. *Id.* at 339.

In assessing the validity of the stop, the New Hampshire court recognized the settled principle that reasonable suspicion to undertake a brief investigative detention "'is a less demanding standard than probable cause not only in the sense that [it] can be established with information that is different in quantity of content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.'" *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)) (alteration in original); see also *Lamb*, 168 Vt. at 196, 720 A.2d at 1102 (reasonable suspicion is less demanding standard than probable cause, and need not be based upon officer's personal observation). To assess the reliability of information received from an anonymous informant, the court considered three factors: the nature and specificity of the information conveyed; the extent of corroboration by the officer; and the urgency of effectuating a stop in the circumstances.

As to the nature of the information, the court noted that it contained a specific description of the car, its exact location at a moment in time, and its direction and prior movements, all of which "reasonably support[ed] a conclusion that the caller had personally

---

[2] As discussed more fully below, the United States Supreme Court recently held that the anonymous report of an individual in possession of a gun did not, without more, provide a sufficient basis for a stop and frisk. See *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000). Although this decision casts doubt upon several of the weapons cases relied upon in *Lamb*, it does not control or undermine the numerous drunk-driving decisions on which it also relied, and which, as explained below, are distinguishable in key respects from *J.L.* Thus, contrary to the dissent, there is nothing "troubling," 171 Vt. at 428, 765 A.2d at 881, about the Court's reliance on *Lamb*.

observed the vehicle." *Melanson*, 665 A.2d at 340. Next, the court noted that the officer was able to determine within a few minutes of the call that the informant had accurately described the vehicle and its current location and direction, "support[ing] the complainant's credibility" and "the officer's conclusion that the informant had actually observed the reported behavior." *Id.*

Finally, the court recognized that "the officer faced the potential of a dangerous public safety hazard." *Id.* Unlike a situation where the information concerns the transportation of controlled substances, and the officer could safely observe the defendant to obtain additional incriminating information,

> here failure quickly to stop the defendant's vehicle in order to confirm or dispel the officer's suspicions could have exposed the public as well as the defendant herself to the danger of an impaired driver. The officer's ability to observe incriminating behavior, therefore, *was limited by the exigency of the situation.*

*Id.* (emphasis added).

In addition to the ruling by the New Hampshire court, *Lamb* also relied on the Kansas decision in *State v. Tucker*, 878 P.2d 855 (Kan. Ct. App. 1994), which again presented the scenario of an officer responding to a radio dispatch based upon an anonymous report of erratic driving. The caller described the vehicle, its location on the highway, and direction of travel. The officers located the car, followed a short distance, and — despite having observed no erratic driving — made an investigative stop which led to a DUI arrest. Applying an analysis similar to that in *Melanson*, the court observed that the anonymous tip suggested some firsthand knowledge, was corroborated by the police within a short time, and required immediate investigation in order to prevent potential injury to the driver and the public.

The Kansas court's discussion of the necessary balancing between the driver's constitutional right to privacy and the public's interest in safety bears repeating. That balancing, the court observed, "must consider the risk to the public of not making an immediate stop against the right of an individual to be free from such stops. We believe that, where the danger to the public is clear, urgent, and immediate, the equation must be weighted in favor of protecting the public and removing the danger." *Id.* at 861. Applying that equation to the case at bar, the court concluded that the risk of not making an

immediate stop was "death and destruction on the highways. This is not a risk which the Fourth Amendment requires the public to take." *Id.* at 862.

*Lamb* did not stop there. In addition to *Melanson* and *Tucker*, it cited and relied on *State v. Markus*, 478 N.W.2d 405, 408 (Iowa Ct. App. 1991) (officers receiving anonymous tip of intoxicated driver did not have to observe erratic behavior "to stop the defendant and investigate this exigent circumstance"); *People v. Rance*, 644 N.Y.S.2d 447, 447 (App. Div. 1996) (police stop of reportedly intoxicated driver "may be based upon information from an anonymous source where, as here, it relates to 'matters gravely affecting personal or public safety'") (quoting *People v. Taggart*, 229 N.E.2d 581, 586 (N.Y. 1967)); and *Kaysville City v. Mulcahy*, 943 P.2d 231, 236 (Utah Ct. App. 1997) (report of intoxicated driver supported investigative stop despite lack of personal observation by officers).[3]

Other decisions, not cited in *Lamb*, though closely on point, include: *State v. Smith*, 638 N.E.2d 1353, 1356 (Ind. Ct. App. 1994) (radio dispatch conveying information based upon report of erratic behavior by grey Dodge Dakota pickup traveling westbound on I-70 near Clay-Putnam county line provided reasonable suspicion to support investigative detention); *State v. Slater*, 986 P.2d 1038, 1046 (Kan. 1999) (approving *Tucker* in upholding stop based upon anonymous call to police dispatcher regarding possible drunk driver and describing make and location of vehicle); *State v. Sampson*, 669 A.2d 1326, 1327 (Me. 1996) (anonymous tip of "possible drunk-driver," together with vehicle description, provided reasonable suspicion sufficient to support investigatory stop); and *State ex rel. Taxation & Revenue Dep't Motor Vehicle Div. v. Van Ruiten*, 760 P.2d 1302, 1305 (N.M. Ct. App. 1988) (radio dispatch to officer based upon unidentified caller's report of suspected drunk driver in white pickup leaving store and heading south on highway supported investigative detention despite lack of corroborating evidence).[4]

The case law is not unanimous. In *State v. Miller*, 510 N.W.2d 638, 639 (N.D. 1994), the court considered a motor vehicle stop based upon an anonymous informant's report that the driver of a pickup in a fast-food drive-up lane "could barely hold his head up." The majority

---

[3] In *Kaysville* the informant identified himself, and therefore it did not, like the other cases cited, involve an anonymous informant. 943 P.2d at 233.

[4] In light of these decisions, the dissent's assertion that "there is no precedent" for the Court's decision, 171 Vt. at 423, 765 A.2d at 877, is puzzling.

there concluded that the "quality" of the tip, which misdescribed the color of the pickup and gave no indication of incriminating behavior other than the ambiguous statement that the driver could not hold his head up, was insufficient to support the stop. *Id.* at 644. In so holding, however, the court suggested that a more accurate and specific report of erratic driving might have been sufficient, even without personal observation of the incriminating behavior, to support an investigative detention. See *id.* at 645.

In *McChesney v. State*, 988 P.2d 1071, 1078 (Wyo. 1999), the Wyoming Supreme Court ruled in a sharply divided three-to-two decision that a radio dispatch of erratic driving based upon an anonymous tip was insufficient to support an investigative detention, absent some independent corroboration of the tip by the investigating officer. In so holding, the court noted that its ruling was consistent with state highway-patrol policy that officers "will not make a stop unless police observation confirms either the report[] or some other illegal or suspicious activity." *Id.* at 1077. In a vigorous dissent, however, two justices argued that,

> [g]iven the totality of the circumstances in this case, which included the description of the vehicle . . . ; the location and direction of travel; the discovery by the officer of a vehicle matching that description; the arrival of that vehicle within a predictable time frame; and the clear statement of aberrant driving . . . , the officer had sufficient reasonable suspicion to accomplish an investigatory stop.

*Id.* at 1079. After citing the numerous decisions from other states upholding its position, the dissent concluded with language equally applicable here:

> Certainly the individual is concerned, and justifiably, with an "intrusion upon cherished personal security . . ." The duty of the officer is to concern himself with protection of the public from the hazards associated with intoxicated drivers.
>
> . . . .
>
> . . . If the circumstances involve a threat to the lives or safety of others that is posed by someone who may be driving while intoxicated or impaired, *the reasonable officer must pursue an investigation.*

*Id.* at 1081 (quoting *Terry*, 392 U.S. at 25) (emphasis added).[5]

The recent decision of the United States Supreme Court in *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000), also provides an illuminating contrast to the case at bar. In a relatively brief, unanimous ruling the high court there held that, absent any other indicia of reliability, an anonymous tip that an individual was in possession of a firearm did not justify a stop and frisk. In so holding, the Court rejected the government's argument that firearms were sufficiently dangerous in and of themselves to justify dispensing with the requirement of reliability. The Court was particularly careful, however, to limit its holding to the facts, explaining: "The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.* at 273, 120 S. Ct. at 1380. It held only "that an anonymous tip lacking indicia of reliability of the kind contemplated in *Adams* and *White* does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274, 120 S. Ct. at 1380.

The case before us differs from *J.L.* in several critical respects. First, the information here was more reliable.[6] The Court in *J.L.* emphasized that the anonymous informant had provided nothing more than a bare-bones description of an individual standing at a bus stop. Hence, there was none of the "predictive" information about the individual's movements which lent credibility to the anonymous informant in *White*, 496 U.S. at 332. Here, in contrast, the informant described with particularity, and accurately predicted, the location of

---

[5] Although the dissent cites an additional ten state and federal decisions involving anonymous tips, see 171 Vt. at 429-30, 765 A.2d at 881-82, only one of these, *State v. Lee*, 938 P.2d 637 (Mont. 1997), involved an anonymous, uncorroborated report of DUI, and *Lee* is arguably more favorable to the Court's position than the dissent's. There the caller stated that he "believed" an identified driver was under the influence of alcohol. *Id.* at 638. The Montana court concluded that "under the totality of the circumstances, as applied to the facts in this case," the information was not sufficiently reliable. *Id.* at 640. In so holding, however, the court stressed that merely stating a "belief" the driver was intoxicated, without indicating some basis for the belief or some personal observation of speeding or erratic driving, undermined the caller's reliability. See *id.* Here, in contrast, the caller provided a specific description, location, and direction of travel, and a report of erratic driving.

[6] Contrary to the assertion of the dissent, we do not "ignor[e] the requirement of reliability for anonymous tips" of erratic or drunk driving. 171 Vt. at 423, 765 A.2d at 877. Rather, we hold that the totality of the factual circumstances in this case satisfied the requirements of reliability.

a fast moving vehicle on a freeway, information which the officer confirmed within minutes of the call.[7]

The Supreme Court also noted the relative *lack* of urgency confronting the investigating officers. While acknowledging that guns are dangerous, the Court analogized the situation to one involving an anonymous tip concerning possession of narcotics. In either case the contraband *could* pose a potential public risk, but in neither is the danger particularly imminent. Thus, the Court rejected a rule that would have dispensed with the requirement of reliability "whenever and however" the information involved a gun. *J.L.*, 529 U.S. at 274, 120 S. Ct. at 1380. At the same time, however, the Court carefully limited its holding to the facts, declining to "speculate" about situations involving other types of dangers, such as a report of a person carrying a bomb. *Id.* at 273-74, 120 S. Ct. at 1380.

In contrast to the report of an individual in possession of a gun, an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action. In the case of a concealed gun, the possession itself might be legal, and the police could, in any event, surreptitiously observe the individual for a reasonable period of time without running the risk of death or injury with every passing moment. An officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury. Indeed, a drunk driver is not at all unlike a "bomb," and a mobile one at that.[8]

Finally, in contrast to the police search and seizure of the person in *J.L.*, the police "intrusion" here, as in most DUI cases, consisted of a simple motor vehicle stop, "a temporary and brief detention that is

---

[7] This was admittedly a close case, and we readily endorse the concurring opinion's implicit suggestion that other indicia of an anonymous informant's identity — such as a voice recording or other tracing of the call — should be offered by the State if available. Even without such evidence, however, we are persuaded that the circumstances here, viewed in their totality, established a sufficient basis for an investigative detention. Nevertheless, we would stress that the issue of whether reasonable suspicion supported a particular stop is factually driven, and depends upon the totality of the circumstances in each case. To conclude, as the dissent suggests, that our holding somehow provides a "disincentive," 171 Vt. at 427 n.1, 765 A.2d at 800 n.1, for the State to present the most thorough evidence available would be a serious mistake.

[8] Even in cases involving possession of a handgun, *J.L.* represents a narrow ruling carefully confined to its facts. The police officer there observed no weapon or evidence of a weapon. Would *J.L.* control where the officer, upon arrival, observed an individual walking down a crowded street carrying a handgun in full view? We do not read the Supreme Court decision as preventing an officer in these circumstances from briefly stopping and questioning such an individual, even if — as in Vermont — such possession is lawful. As in the case of a reportedly erratic driver, the risk of imminent violence — and the necessity of prompt intervention — distinguishes the case from *J.L.*

exposed to public view." *State v. Zumbo*, 157 Vt. 589, 592, 601 A.2d 986, 988 (1991). In determining the validity of a stop, it is not unreasonable to consider both the risk of harm resulting from a failure to detain the driver, and the level of intrusiveness occasioned by a detention. See *State v. Richardson*, 456 N.W.2d 830, 834 (Wis. 1990) (reasonableness of stop "is a common sense question, which strikes a balance between the interests of society in solving crime and the members of that society to be free from unreasonable intrusions") (internal quotation marks and citation omitted). The police intervention here consisted initially of a brief motor-vehicle stop and questioning, not a hands-on violation of the person. Thus, the liberty interest at stake in this case did not rise to the level which confronted the Court in *J.L.*

Viewed in light of the Supreme Court's decision in *J.L.*, this Court's recent decision in *Lamb*, and the vast majority of well reasoned decisions from other states, the conclusion follows inescapably that the investigative detention in this case was sound. The informant reported a vehicle operating erratically; provided a description of the make, model and color of the subject vehicle, as well as the additional specific information that it had New York plates; identified the vehicle's current location; and reported the direction in which it was traveling. The officer went to the predicted location and within minutes confirmed the accuracy of the reported location and description, thus supporting the informant's credibility and the reasonable inference that the caller had personally observed the vehicle. The information that the vehicle was acting "erratically" equally supported a reasonable inference that the driver might be intoxicated or otherwise impaired. See Webster's New International Dictionary 869 (2d ed. 1955) (defining "erratic" as "[h]aving no certain course; wandering; moving").

Lastly, the reasonableness of the stop may be assessed in light of the "gravity of the risk of harm." *Lamb*, 168 Vt. at 200, 720 A.2d at 1105. We have consistently recognized "the serious threat posed to public safety by the frequency with which individuals, while under the influence of intoxicating liquor, continue to operate motor vehicles on the public highways." *State v. Martin*, 145 Vt. 562, 568, 496 A.2d 442, 447 (1985). Balancing the public's interest in safety against the relatively minimal intrusion posed by a brief investigative detention, see *State v. Lambert*, 146 Vt. 142, 143, 499 A.2d 761, 762 (1985), the scale of justice in this case must favor the stop; a reasonable officer could not have pursued any other prudent course.

*Affirmed.*

**Skoglund, J.,** concurring. The dissent asks, "what would the Supreme Court do" if confronted with the facts in this case and expresses concern that the majority has created an "exception to our established search and seizure jurisprudence for which there is no precedent and no conceivable limit." 171 Vt. at 423, 765 A.2d at 877. While I fully agree with the reasoning of the majority in the case at bar, I write in concurrence to dispel the concerns held by the dissent. This task is not an easy one. "Interpretation of the fourth amendment is not a model of intellectual consistency." *Edmond v. Goldsmith,* 183 F.3d 659, 668 (7th Cir. 1999).

As the opening sentence in *Terry v. Ohio* stated: "This case presents serious questions concerning the role of the Fourth Amendment in the confrontation on the street between the citizen and the policeman investigating suspicious circumstances." *Terry v. Ohio,* 392 U.S. 1, 4 (1968). In *Terry,* the Court first recognized the authority of law enforcement officers to stop and frisk an individual absent probable cause for an arrest. Subsequent decisions of the Court have added dimension to the scope of *Terry* and extended its holding into areas probably not contemplated when the decision was rendered in 1968, decisions that, as discussed below, have proved disturbing to several respected Justices of that Court.

Prior to *Terry,* the Court had recognized that the "Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California,* 384 U.S. 757, 768 (1966).[1] The Court echoed *Schmerber* in *Terry* when it wrote, "[o]f course, the specific content and incidents of this right must be shaped by the context in which it is asserted. For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *Terry,* 392 U.S. at 9 (quoting *Elkins v. United States,* 364 U.S. 206, 222 (1960)).

To answer the question "what would the Court do in this case?" we need to examine what it has found to be "reasonable" under the Fourth Amendment and why, and to review how it has handled other cases in which the basis of the officer's suspicion comes not from personal observation but rather from an informant's tip.

---

[1] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

*Terry* is the seminal case in the area and the logical place to start. There, an officer found the behaviors of two men to be suspicious, testifying that "they didn't look right to me at the time." 392 U.S. at 5. The officer observed the men as they repeatedly took turns walking a short distance down the street and looking into a store window. The officer suspected they were "casing a job, a stick-up." *Id.* at 6. Eventually, the officer approached them, asked their names, received a mumbled response, grabbed Terry, spun him around and patted down the outside of his clothing for weapons. A gun was recovered and Terry was charged with carrying a concealed weapon.

The Court began its analysis in *Terry* by identifying the "central inquiry under the Fourth Amendment — the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19. "[W]ould the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22. It found that the officer was discharging a legitimate investigative function when he approached Terry and his companions after viewing their suspicious behavior. "It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Id.* at 23.

The Court emphasized, however, that the propriety of the stop was not the crux of the case. Rather, it was the officer's "invasion of Terry's personal security by searching him for weapons in the course of that investigation." *Id.* The Court's analysis of the frisk focused on the safety of law enforcement officers in their daily interactions with suspected criminals and ordinary citizens, remarking: "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Id.* The Court found no offense to the Fourth Amendment when the officer took necessary measures to determine if the men were in fact carrying weapons.

Thus, from *Terry* we take the test of whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place, recognizing that we deal in this case not with a search, but only with a limited seizure, a brief investigatory detention of a vehicle on a public highway. See *Michigan Dep't of State Police v. Sitz*, 496 U.S.

444, 451 (1990) (level of intrusion of brief roadside sobriety checkpoint "is slight").[2]

To adequately appreciate the significance of *Terry* and its progeny for this and other cases one need look no further than the opinions of the dissenting Justices. Justice Douglas was the lone dissenter in *Terry*, and he bitterly decried the demise of the requirement that a police officer have probable cause before effecting a search and seizure without a warrant, alleging that the decision was in response to "powerful hydraulic pressures" to "water down constitutional guarantees and give the police the upper hand." 392 U.S. at 39.

Four years after *Terry*, the Court considered whether a stop and frisk had to be based on the officer's personal observations, and answered the question with an emphatic "no." In *Adams v. Williams*, 407 U.S. 143 (1972), an informant who had previously provided information to the officer approached the officer at 2:15 a.m. and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. The officer went to the car, tapped on the car window and asked the occupant, Williams, to open the door. Instead of opening the door, Williams rolled down the window. The officer quickly reached into the car and removed a gun from Williams' waistband. Williams was tried and convicted of possession of a handgun and possession of heroin found during a full search incident to his arrest on a weapons charge.

The Court applied the test it had developed in *Terry* — whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place — and upheld the seizure. The majority reasoned that the officer was acting on a tip from an informant he knew, who had provided information previously, and whose information was immediately corroborated at the scene when the officer reached into the car window and retrieved the gun that the informant said would be there. The Court upheld the search as well, holding that it "constituted a limited intrusion designed to insure [the officer's] safety." *Id.* at 148. In so holding, the majority noted that the informant could have been subject to immediate arrest for making a false complaint had his information not been verified.

---

[2] The sequel to the seizure — the interaction between the officer and the driver and the officer's observations of impairment from outside the car — did not rise to the level of a search as that term has been interpreted by the Court. See *United States v. Place*, 462 U.S. 696, 707 (1983); *Texas v. Brown*, 460 U.S. 730, 739-40 (1983).

Again, reading the dissenting opinions in *Adams* illuminates the decision's broad significance. This time Justices Douglas, Marshall and Brennan dissented. Justice Douglas opined that the "easy extension of *Terry v. Ohio* . . . to 'possessory offenses' is a serious intrusion on Fourth Amendment safeguards." *Id.* at 151. Justice Brennan rued the extension of *Terry* to possessory offenses as well, arguing that the *Terry* rule was intended only for serious cases of imminent danger or of harm recently perpetrated to persons or property, not to conventional possessory offenses. *Id.* at 153 (quoting *Williams v. Adams*, 436 F.2d 30, 39 (2d Cir. 1970) (Friendly, J., dissenting)). Justice Brennan also shared the concerns expressed by the dissenting lower court judge, Judge Friendly, who noted that there was no guarantee of a patrolling officer's veracity when he testifies to a "tip" from an unnamed informer. (The informant was never named during the trial of defendant.) Justice Marshall focused his analysis on the quality of the informant's contribution — the only basis for sustaining the officer's actions — concluding that it was insufficient to be considered reliable. *Id.* at 155-59. He noted that the only other time this particular informant had provided information to the officer, it did not involve guns or narcotics and had, in fact, proved to be unsubstantiated. Further, there was no evidence the informant could identify narcotics, even if he could identify a gun on sight. Even assuming the officer had some basis for relying on the informant, Justice Marshall argued that *Terry* required the information demonstrate that the suspect is armed and dangerous. As he observed: "The fact remains that Connecticut specifically authorizes persons to carry guns so long as they have a permit. Thus, there was no reason for the officer to infer from anything that the informant said that the respondent was dangerous." *Id.* at 159-60. Of the majority's decision, he wrote, "the Fourth Amendment, which was included in the Bill of Rights to prevent the kind of arbitrary and oppressive police action involved herein, is dealt a serious blow." *Id.* at 162.

The case before us is similar in one respect to *Adams* — we do not know the informant's name. It is also distinguishable. In *Adams*, the informer would have required inside information to know that the suspect was carrying a gun without a permit or had narcotics on his person. Yet, as Justice Marshall noted, no such inside information was established in the record. This did not, however, give the Court pause. The case before us is stronger. While the record did not disclose exactly how the informant came into the information that was relayed to the officer concerning defendant's erratic driving, the observation

could easily and accurately have been made by anyone driving on the same highway. One did not require access to inside information or knowledge of the suspect's prior activities or personal proclivities to observe such public criminal behavior. Further, there can be no concern here, as was raised by the dissenting Justices in *Adams*, that the officer might have fabricated the anonymous tip. The evidence that he received the tip by way of a "be-on-the-lookout" (BOL) from the State Police dispatcher was uncontested.

Thus, the Court's language and holding in *Adams* apply as well to the case at bar: "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146.

The next case of significance is *Alabama v. White*, 496 U.S. 325 (1990), which involved an anonymous telephone tip that defendant, White, would be leaving a particular apartment at a particular time in a particular vehicle, that she would be going to a particular motel and that she would be carrying an attaché case that contained cocaine. Police observed White leave the apartment complex, albeit from a different apartment, enter the described vehicle and drive in the direction indicated in the tip. She was not carrying an attaché case. Police stopped White and conducted a consensual search of her car, which revealed marijuana. During the station house processing of White, cocaine was found in her purse.

The Court began its analysis by noting that while it had abandoned the traditional two-pronged test of an anonymous tip in the probable-cause context in favor of a "totality of the circumstances" approach, *id.* at 328 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)), the same factors remained relevant in determining the value of an informant's report: the informant's veracity and reliability, and the basis of the informant's knowledge, *id.* (citing *Gates*, 462 U.S. at 230). The Court then held that these factors were also relevant in the reasonable-suspicion context, "although allowance must be made in applying them for the lesser showing required to meet that standard." *Id.* at 328-29. In this regard, the Court cited its recent pronouncement in *United States v. Sokolow*: "The officer [making a Terry stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for making the stop." *Id.* at 329-30 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks and citations omitted; alteration in original).

The Court in *White* elaborated further on the distinction between reasonable suspicion and probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Id.* at 330.

Applying this standard, the Court found, under the totality of the circumstances, that the anonymous tip, as corroborated by the officers, exhibited sufficient indicia of reliability to justify the investigatory stop of the car. In so holding, the Court placed considerable reliance on the fact that the anonymous tip included predictions of future actions by White, specifically her travel towards the predicted destination. Again, the dissenting opinions are revealing. Justice Stevens, writing for Justices Brennan and Marshall, noted that "[m]illions of people leave their apartments at about the same time every day carrying an attaché case and heading for a destination known to their neighbors. . . . An anonymous neighbor's prediction about somebody's time of departure and probable destination is anything but a reliable basis for assuming that the commuter is in possession of an illegal substance — particularly when the person is not even carrying the attaché case described by the tipster." *Id.* at 333. The dissent also raised concerns about an officer's veracity in claiming to have received an anonymous tip. "[U]nder the Court's holding, every citizen is subject to being seized and questioned by any officer who is prepared to testify that the warrantless stop was based on an anonymous tip predicting whatever conduct the officer just observed." *Id.*

The dissent in *White* pointedly illustrates the Court's generous approach to the finding of reasonable suspicion on the basis of an anonymous informant's tip. Furthermore, while *White* relied heavily on the predictive information of the suspect's itinerary, other federal courts interpreting *White* have held that predictive information may be sufficient, but is not necessary, to establish reasonable suspicion. See, e.g., *United States v. Gibson*, 64 F.3d 617,˙623 (11th Cir. 1995) ("*White* does not prevent law enforcement officers from relying and acting on anonymous tips when the information to be corroborated

does not refer to future actions but instead details present circumstances."); *United States v. Bold,* 19 F.3d 99, 104 (2d Cir. 1994) ("There is nothing in *White* that precludes police from acting on an anonymous tip when the information to be corroborated refers to present rather than future actions.").

Thus, notwithstanding the fact that the suspect in the case before us was traveling on a public access highway and that little precognition was needed to deduce that the car would continue on that highway, the tip does not fail for lack of predictive information. Moreover, as noted earlier, the facts here do not present the same potential for law-enforcement fabrication of anonymous tips that so concerned the dissenters in *Adams* and *White.*

Recently, the Court decided *Illinois v. Wardlow,* 528 U.S. 119 (2000), a decision that further spotlights the Court's liberal standards for finding "reasonable suspicion." In this case Wardlow, who had simply been standing next to a building, fled upon seeing a four car police caravan driving by, apparently on its way to an area known for heavy narcotics trafficking. Officers Nolan and Harvey chased him down and conducted a protective pat-down search for weapons. Discovering a .38 caliber handgun, the officers arrested Wardlow for unlawful use of a weapon by a felon. He was convicted of same in a bench trial.

The Illinois Appellate Court reversed Wardlow's conviction, concluding that the gun should have been suppressed because the officer lacked reasonable suspicion sufficient to justify an investigative stop pursuant to *Terry.* The Illinois Supreme Court agreed, holding that sudden flight in a high crime area does not create a reasonable suspicion justifying a *Terry* stop. In a split decision, the Supreme Court reversed, deciding the case solely on the question of whether the initial stop was supported by reasonable suspicion. The Court found that the location of the stop (a high crime area), coupled with Wardlow's actions — he fled — were sufficiently suspicious to warrant further investigation. It wrote: "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. . . . Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further." *Id.* at 125. While conceding that there may be innocent reasons for fleeing from the police and, therefore, that flight is not necessarily indicative of ongoing criminal activity, the Court nevertheless re-emphasized the holding of *Terry* that the officers could detain the individual to resolve the ambiguity presented.

Four Justices dissented from the Court's conclusion that officer Nolan had reasonable suspicion sufficient to stop Wardlow. As Justice Stevens, who authored the dissenting opinion, succinctly stated, "I am not persuaded that the mere fact that someone standing on a sidewalk looked in the direction of a passing car before starting to run is sufficient to justify a forcible stop and frisk." *Id.* at 140. While Wardlow did not involve an anonymous tip but rather the observations of the apprehending police officers, it does illustrate how lean the facts of suspicious circumstances may be and still weigh in favor of the law enforcement officer's actions. Most recently, in March of this year, the Court decided *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000). Contrary to the dissent's assertion, *Florida v. J.L* is not a closely analogous case. It does, however, reveal where the Court will draw the line when anonymous callers allege concealed criminal activity.

The facts in *J.L.* are set forth in the majority and dissenting opinions, so I mention them only briefly. In *J.L.* the police received an anonymous tip of concealed wrongdoing, specifically that a person was carrying a gun. The Court, in a unanimous decision, held that such a tip was insufficient to justify a police officer's stop and frisk of that person, because, while the tip gave an accurate description of a subject's readily observable location and appearance, it did not show "that the tipster ha[d] knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272, 120 S. Ct. at 1379.

The Court also rejected the State's argument that the *Terry* analysis should be modified to license a "firearm exception." *Id.* It reasoned that an automatic firearm exception to the established reliability analysis would "rove too far," enabling anyone to harass another by setting in motion intrusive, embarrassing police searches by merely placing an anonymous call alleging the subject was carrying a gun or even narcotics. *Id.* "As we clarified when we made indicia of reliability critical in *Adams* and *White*, the Fourth Amendment is not so easily satisfied." *Id.* at 273, 120 S. Ct. at 1380.

All of which virtually compels me to ask: If J.L. had turned on his heel and run away when he saw the police officer's approach, as Wardlow had done, would the Court have found the police justified in their response under the Fourth Amendment? Probably so, if the bus stop was in a "high crime" area.

It is also difficult to reconcile the decision in *J.L.* with the Court's earlier holding in *Adams*, remembering that there was no evidence in

that case to show the basis of the anonymous informant's knowledge that the defendant, a man sitting in a car readily observable by anyone walking by, was carrying narcotics, the only assertion of an illegality involved.

Nevertheless, as the majority here aptly notes, the Court in *J.L.* stressed that its decision was closely confined to the facts: "The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.* at 273, 120 S. Ct. at 1380. The Court hypothesized that a report of a person carrying a bomb as an example of a tip that might require less indicia of reliability than a report of a person carrying a gun. It is important to note that both are allegations of possessory offenses.

Which brings me to what I believe has been the dominant and determinative factor in the Court's development of Fourth Amendment search and seizure law — the unrelenting extension of the principles of *Terry* to cases where the suspected illegal activity is a possessory offense. *Florida v. J.L.* (gun), *Alabama v. White* (drugs), *United States v. Sokolow* (drugs) and *Adams v. Williams* (drugs and gun) all involved possessory offenses. The cases relied on by the dissent, *State v. Altieri*, 951 P.2d 866, 867 (Ariz. 1997) (drugs),[3] *Commonwealth v. Lyons*, 564 N.E.2d 390, 391 (Mass. 1990) (drugs), *State v. Kennison*, 590 A.2d 1099, 1100 (N.H. 1991) (drugs), *United States v. Soto-Cervantes*, 138 F.3d 1319, 1321 (10th Cir. 1998) (drugs), *United States v. Roberson*, 90 F.3d 75, 79 (3d Cir. 1996) (drugs), all involve possessory offenses. The concerns expressed by Justices Douglas, Brennan and Marshall have receded into history. Application of *Terry* principles to police actions involving such offenses has become standard.

These decisions are significant, not least because the case before us is so clearly distinguishable. The offense alleged here did not involve a concealed crime — a possessory offense. What was described in the police dispatch to the arresting officer was a *crime in progress*, carried out in public, identifiable and observable by anyone in sight of

---

[3] *Altieri* dealt with an anonymous tip about possession of marijuana. The Arizona court found the tip insufficient to provide reasonable suspicion for the stop. *Altieri* does not mention an earlier Arizona Court of Appeals case, *State v. Robles*, 831 P.2d 440 (Ariz. Ct. App. 1992), which upheld the stop of a pickup truck based on a dispatch to the arresting officer that a blue pickup truck with primer spots was driving erratically in a certain area with no description of the driver or license number. Officers located a vehicle matching the description and stopped the truck without observing any erratic driving.

its commission. Unlike the tip alleged in *White* — that White was carrying narcotics — or in *Adams* — that the defendant was carrying narcotics and a gun — here a total stranger could have observed defendant's driving abilities. No intimate or confidential relationship was required to support the accuracy of the observation. The caller simply reported a contemporaneous observation of criminal activity taking place in his line of sight. (Obviously, the caller may have used words other than "erratic driving" to describe what was observed, and the dispatcher may have reduced the tipster's information to police lingo before issuing the BOL.)

Thus, to return to the question posed at the beginning — "what would the Supreme Court do under the facts of this case?" — I suggest that it would begin by observing that the veracity, reliability, and basis of the tipster's knowledge must be evaluated under the lesser standard of reasonable suspicion. If probable cause — the level of suspicion adequate to support a custodial arrest that may last for days — is no more than a 50% likelihood, and reasonable suspicion sufficient to support a frisk is something less than probable cause, then plainly an even lower level of probability is required of a brief investigative stop that poses less intrusion than a physical search of the person. The Court would, I believe, evaluate the governmental interest involved — here, assuring that drunks are quickly removed from our roads — and balance that interest against the reasonableness of the minimal intrusion on the citizen's personal security.

The Court, in fact, performed such a balancing in *Sitz*, where, in evaluating Michigan's use of highway sobriety checkpoints, it weighed the intrusion on the individual's Fourth Amendment interests against the State's interest in preventing drunk driving. *Sitz*, 496 U.S. at 451. It found the highway sobriety checkpoint program to be in conformity with the Fourth Amendment. The Court concluded that the balance favored allowing sobriety checkpoint stops, as the "magnitude of the drunken driving problem" was beyond serious dispute, and the "weight bearing on the other scale — the measure of the intrusion on motorists stopped briefly at sobriety checkpoints — is slight." *Id.*; see also *United States v. Brignoni-Ponce*, 422 U.S. 873, 879-80 (1975) (noting that when an officer stops an automobile and questions its occupants, "the intrusion is modest").

Returning to the test established in *Terry*: Would the facts available to the officer at the moment of the search and seizure warrant a person of reasonable caution to believe that the action taken was appropriate? Where, as here, the level of objective

justification necessary to effectuate the stop is minimal, I believe the conclusion is inescapable that it would. As the court observed in *State v. Tucker*, 878 P.2d 855, 858 (Kan. Ct. App. 1994), this case necessarily involves "the ever-changing equation used to balance the rights of an individual to be free from unwarranted intrusions of his or her freedom of movement and right to privacy with the right of the public to be protected from unreasonable danger. This equation and the balance change with the facts presented." The risk to the public in this case was *not* that an illegal drug or a concealed weapon might go undetected. This risk here was a drunk driver maneuvering a thousand pounds of steel, glass and chrome down a public road. I have no doubt that, under the totality of the circumstances presented, the Supreme Court would conclude the stop did no violence to the protections embodied in the Fourth Amendment.

The dissent asserts otherwise, suggesting that the majority opinion gives the public "the power to cause the search or seizure of a person driving a car." 171 Vt. at 423, 765 A.2d at 877. I agree. But is that not what we invite when we encourage the public to "GET A DWI" and provide an "800" telephone number for them to call when they observe what they believe to be drunk driving? And do we not benefit when the citizenry cooperates with law enforcement to remove dangerous drivers from our highways? If the caller is wrong, if the driver is not impaired, the driver will proceed on his or her journey after a brief roadside detention. As the Court in *Wardlow* wrote, "In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people." 528 U.S. at 126. If the caller is correct, however, a drunk driver will have been removed from the streets. As one commentator has explained: "Because the very purpose of [investigatory] stops is to clarify ambiguous situations, 'even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent.'" 2 W. LaFave, et al., Criminal Procedure § 3.8, at 242 (2d ed. 1999) (quoting *United States v. Holland*, 510 F.2d 453, 455 (9th Cir. 1975)) (emphasis in original).[4]

---

[4] We recently decided that the standard of reasonable grounds, as used in V.R.Cr.P. 41.1 governing nontestimonial identification orders (NTO), was satisfied by the information available to the police about a suspect in an unsolved murder. In *In re Nontestimonial Identification Order Directed to R.H.*, 171 Vt. 227, 762 A.2d 1239 (2000), we acknowledged that there was no direct evidence of defendant's involvement in the crime, no witnesses placing him at the scene, and he made no statement that could be interpreted

I am compelled to make one additional comment on this case. When an informant places an anonymous telephone call to the police, "the informant has not placed his credibility at risk and can lie with impunity." *J.L.*, 529 U.S. at 275, 120 S. Ct. at 1381 (Kennedy, J., concurring). Justice Kennedy went on to observe, however, that there may be "many indicia of reliability respecting anonymous tips" that the cases had not explored. *Id.* at 274, 120 S. Ct. at 1380-81. In *J.L.*, however, the record in this regard was barren; it did not show whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number.

The record in this case does not reveal much more. We know the information came to the arresting officer by way of a radio dispatch from the Vermont State Police dispatcher requesting that officers be on the lookout for a particularly described vehicle being operated erratically on I-89.[5] Nevertheless, with the advent of instant caller-identification, widely available and in use by the public and the police, there is increasing awareness of the lack of true anonymity in today's telecommunication world. I am equally certain that the general public is well aware of the fact that it is a crime to make a false report to police. See 13 V.S.A. § 1754.

The possibility that a citizen may provide an erroneous anonymous tip out of spite or general evil intentions should not restrain law enforcement officers from responding when it is reasonable to do so. It is the oppressive and unwarranted actions of government that the Fourth Amendment protects against. The Constitution is not violated when we allow the police to assume good faith on the part of the citizens of our state, just long enough to effectuate a brief, limited

---

as demonstrating responsibility. All the police knew was that the suspect was familiar with the remote area in which the crime occurred and had a long history of violence against women, the most recent episode of which involved conduct consistent with how the murder victim's killer must have acted. We concluded that the facts supporting defendant's involvement "are specific and articulable" and supported a "reasonable suspicion" that defendant had killed the victim sufficient to warrant issuance of the NTO. *Id.* at 232, 762 A.2d at 1243. We held that this case "involved more than a hunch." *Id.* at 233, 762 A.2d at 1243. After execution of the NTO-testing of DNA recovered from the victim's body-the suspect was cleared. The failure of the DNA match did not, however, negate the reasonable-suspicion finding.

[5] I repeat with regret the comment made by Justice Dooley in his dissent in *State v. Lamb*, 168 Vt. 194, 203 n.*, 720 A.2d 1101, 1107 n.* (1998) (Dooley, J., dissenting): "I can't help believe, however, that this case is before us because the State never obtained evidence from the dispatcher who could have provided more information on the tip." Again we have a case where we must assume that the tip was anonymous, though the trial court never expressly found it so, because the State failed to present evidence from the dispatcher who could have provided more information about the tip.

roadside stop to determine if the tip came from a prankster or a concerned fellow traveler.

For these reasons, I concur in the Court's reasoning and decision to affirm the judgment. I am authorized to state that Chief Justice Amestoy joins in this concurring opinion.

**Johnson, J.,** dissenting. Constitutional rights are not based on speculations. Whatever frightening scenarios may be imagined by police officers or appellate judges, the Framers of our Constitution struck a balance between individual privacy and the intrusive power of government, a balance that we have a duty to protect. The Fourth Amendment is the source of protection against searches and seizures that are based on unreliable information. When an anonymous tip provides the sole basis for the seizure, the need for reliability is heightened. Today's decision allows the police to dispense with this constitutional requirement and turn over to the public the power to cause the search or seizure of a person driving a car.

In this case, Officer Billings was told to be on the lookout for a particular car because the driver was allegedly "operating erratically." On the basis of that instruction, nothing else, he stopped Ms. Boyea. He corroborated only the generally-available information about the exterior of the car described by the tip. During the time he had her in sight while she exited the highway, he saw nothing to arouse suspicion. The majority claims that the "totality of the factual circumstances in this case satisfied the requirements of reliability." 171 Vt. at 408 n.6, 765 A.2d at 867 n.6. It asserts that the tip "predicted" information that the police officer verified and that this predictive value lent credibility to the tip. The "totality of the circumstances" in this case has never been shown to be anything more than an anonymous telephone call claiming that a car on the highway was "operating erratically." The entire predictive value of this tip was that the tipster "predicted" a car on a limited access highway would continue on the highway in the direction it was traveling.

By ignoring the requirement of reliability for anonymous tips, the majority has created an automobile exception to our established search and seizure jurisprudence for which there is no precedent and no conceivable limit. I respectfully dissent.

## I.

The record in this case is indistinguishable from recent and relevant precedent from the United States Supreme Court. Because

defendant has not raised a claim under Article 11 of the Vermont Constitution, we consider the issue solely under the United States Constitution. We are therefore *bound* by the Supreme Court's decisions interpreting the Fourth Amendment. We must apply the Supreme Court precedent using our best judgment about what that Court would do if faced with similar facts. For many years, the Court has required that police action must be based on objectively reliable information. We have the benefit of a recent pronouncement by that Court on the exact issue of anonymous tips, *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000), and yet the majority of this Court dispenses with this precedent and diverges from the Supreme Court's interpretation of the Fourth Amendment in a closely analogous case.

The anonymous tip in *Florida v. J.L.* described a particular person by appearance and specified his location. The tip alleged that a young black male wearing a plaid shirt at a particular bus stop was carrying a gun. Police checking the specified location saw a male matching the description given by the anonymous informant. They saw nothing to indicate any illegal conduct, and the individual made no threatening or suspicious movements. *Id.* at 268, 120 S. Ct. at 1377.

The Supreme Court unanimously held that corroboration of generally available facts about a person's location, appearance, or clothing does not indicate the reliability of the tip. See *id.* at 271-72, 120 S. Ct. at 1379. The Court began its analysis by noting that "'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Id.* at 270, 120 S. Ct. at 1378 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). The tip in *J.L.* came from "an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271, 120 S. Ct. at 1379. Florida and the United States argued that the tip was reliable because its description of J.L. and his location had proved accurate. The Court rejected this analysis, stating "[t]hese contentions misapprehend the reliability needed for a tip to justify a *Terry* stop." *Id.* at 272, 120 S. Ct. at 1379. This kind of public information, the Court explained, does not demonstrate that the tipster has inside information about concealed wrongdoing. The reasonable suspicion needed for such a stop "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* Therefore, the Court held that this tip, lacking indicia of reliability and uncorroborated in its accusation of criminal behavior, did not provide reasonable suspicion for a *Terry* stop. *Id.* at 274, 120 S. Ct. at 1380.

The need for reliability in anonymous-tip cases was first articulated by the Court in *Alabama v. White*. There, the Court held that the assessment of anonymous tips is "dependent upon both the content of the information possessed by police and its degree of reliability." *White*, 496 U.S. at 330. In *White*, an anonymous call reported that Vanessa White would leave a specific apartment in an apartment complex at a particular time, in a brown Plymouth station wagon with the right taillight broken, would drive to Dobey's Motel, and that she would be carrying an ounce of cocaine. *Id.* at 337. Officers observed a woman emerge from the apartment complex at the specified time, enter the described car, and follow the exact route outlined in the anonymous tip. The Court upheld the stop, while acknowledging that it was a "close case," *id.* at 332, and, in fact, three justices dissented forcefully. For the majority, the police corroboration of the tip information established that the tipster was reliable and the tipster's ability to predict White's behavior indicated the basis of knowledge behind the tip. The Court reasoned that, "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *Id.* Because the informant had been proven to be reliable by corroboration of its predictions and the content of the tip was very detailed and specific, the Court upheld the stop.

The *White* Court explained the connection between reliability and content as an inverse relationship. "Reasonable suspicion . . . is dependent upon both the content of information possessed by police and its degree of reliability. . . . [I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330. The Court instructed that the totality of the circumstances approach gives "the anonymous tip the weight it deserve[s] in light of its indicia of reliability as established through independent police work." *Id.* The Court distinguished the *White* information from other tips consisting of "easily obtained facts and conditions existing at the time of the tip." *Id.* at 332. Thus, "easily obtained facts and conditions existing at the time of tip" do not establish the reliability of a tip and form little support for reasonable suspicion.

The *J.L.* Court noted that the tip lacked even the "moderate indicia of reliability present in *White*," *J.L.*, 529 U.S. at 271, 120 S. Ct. at

1379, and it concluded that public information, such as a description of appearance, does not provide a basis for judging the tipster's reliability. Information that simply "identif[ies] a determinate person," *id.* at 272, 120 S. Ct. at 1379, but does not indicate a special or confidential relationship between the informant and the subject of the tip, does not make a tip reliable, even when police can corroborate it, as they did in *J.L.* The Fourth Amendment requires reliability of a different type. Such reliability may be shown by an informant explaining how she/he knows about the illegal behavior, or by other information that demonstrates the informant has "inside information." *Id.* at 271, 120 S. Ct. at 1379. Because the *J.L.* tipster did not indicate such a confidential relationship, nor any other indication of reliability, the tip was not reliable as a basis for the stop-and-frisk.

Reliability, the Supreme Court instructed, may not be dispensed with even in a case involving the immediate and obvious danger of firearms. See *id.* at 272, 120 S. Ct. at 1379. The Court therefore held that police may not conduct *Terry* stops "on the basis of bare-boned tips about guns" because "the Fourth Amendment is not so easily satisfied." *Id.* at 273, 120 S. Ct. at 1380. The Court suggested parenthetically that creating a dangerousness exception for *Terry*-stop requirements would be an exception that could swallow the rule. *Id.* The Court reasoned that "[t]he facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.* Because the prosecution failed to produce a record that showed anything other than a bare, anonymous tip, the record in *J.L.* did not support a finding of any reliability. *Id.* at 274, 120 S. Ct. at 1380.

The record in the instant case is no more complete than in *J.L.* The prosecution in this case failed to produce a record showing anything other than a bare, anonymous tip. The description of defendant's blue-purple Jetta with New York license plates is precisely like the description of a young black man wearing a plaid shirt. And just as J.L. was described as being at a specific bus stop, defendant's car was described at a particular location — on Interstate 89. Finally, the allegation of wrongdoing, J.L.'s carrying a gun and Ms. Boyea's "erratic driving," stands alone, with no explanation of how or why the tipster knows this.

The majority contends that the informant in this case "predicted" that the Jetta would continue to be on the Interstate and that this "prediction" was proven true, thereby corroborating the tip. This

"prediction" is no such thing. The tipster in *J.L.* did not "predict" that J.L. would remain at the bus stop; the tip simply accused a specific person, an actual man at a real location, of carrying a gun. The police then saw the person described at the specified location. The facts in this case are no different. The informant did describe an actual car, Ms. Boyea's car, at a real location, which was on Interstate 89 headed south. This information is not a "prediction" — it is a description, it relates actually existing information about a determinate car but it does not predict the future activities of the driver in a way that demonstrates inside information. That is the hallmark of a prediction that is reliable when corroborated. See *White*, 496 U.S. at 322. This "prediction" is utterly unlike the prediction of *White*, that the defendant would drive a particular car at a particular date and time along a four-mile long route described in minute detail. See *id.* The content of this tip was simply that a specific car was allegedly "operating erratically." In fact, this "prediction" is no more and no less than the "prediction" implicit in the *J.L.* tip that the defendant would continue standing at the bus stop. If the *White* tip, with all of its detail and corroborated predictions, was "close" to the line between reliable and unreliable anonymous tips, *id.* at 332, this accusation of erratic driving is well over the line into unreliability.

It is certainly possible to speculate that the police might have had more information, but they have not shown that they did, and it is not our job to supplement the record. In fact, our job is the opposite; we are not permitted to create a new rule of law in order to compensate for a failure in the record. We are to review the record that was before the trial court and base our decision on that record.[1] This constraint is inherent in the nature of an appellate court; we must bow to "the controlling force of the record" and consider only those facts that were established below. D. Meador & J. Bernstein, Appellate Courts in the United States 55 (1994); see also *In re M.C.P.*, 153 Vt. 275, 296, 571 A.2d 627, 638 (1989) (role of this Court is limited to reviewing trial court findings to determine if they are supported by the record). The State has made no showing that the nature of the tip demonstrated firsthand knowledge, or any basis for knowledge, other than that it identified a particular car on the highway. As the *J.L.* concurrence observed, there might be other characteristics of the tip that support

---

[1] It is ironic that the majority's decision provides a disincentive to the State to create a better record demonstrating the basis for acting on an anonymous tip, since it removes virtually all Fourth Amendment protection from a motor vehicle stop in this context.

its reliability, such as predictive value, prior accurate tips, a face-to-face encounter, or a narrow class of likely informants. *J.L.*, 529 U.S. at 275-76, 120 S. Ct. at 1381 (Kennedy, J., concurring, joined by Rehnquist, C.J.); see also *State v. Lamb*, 168 Vt. 194, 720 A.2d 1101 (1998) (where tip content indicated, inter alia, that it came from one of two women in household with named defendant, it provided reasonable suspicion). Where the State provides no evidence, however, that "the dispatcher or arresting officer had any objective reason to believe that this tip had some particular indicia of reliability," it does not provide a lawful basis for police action. *J.L.*, 529 U.S. at 275-76, 120 S. Ct. at 1381.

Because the claim here is based solely on the Fourth Amendment, we must ask ourselves how the United States Supreme Court would be likely to rule about the anonymous tip in this case after *White* and *J.L.* The majority says we can predict nothing from *White* and *J.L.* because this case involves a car. The majority's rule is that if an automobile-operation crime is alleged, then the crime is so dangerous that police need not have reliable information. This "automobile" exception has no basis in Supreme Court precedent. To the extent there was a "dangerousness" exception developing in the lower courts based on guns, automobiles, and drugs, see 4 W. LaFave, Search and Seizure § 9.4(h), at 230 (3d ed. 1996 & Supp. 2001), that development has been curtailed by the Supreme Court. The *J.L.* Court rejected the developing exception for guns and pointed out that creating such exceptions could swallow the rule of reliability. "[A]n automatic firearm exception to our established reliability analysis would rove too far," concluded the Court, and no one "could . . . securely confine such an exception to allegations involving firearms." *J.L.*, 529 U.S. at 272, 120 S. Ct. at 1379, 1380. It is now less likely that another exception, for automobiles, will emerge after *J.L.*

This Court's decision in *Lamb* reasoned that the principle of the gun-exception cases could be extended to the situation of drunk-driving. See *Lamb*, 168 Vt. at 200, 720 A.2d at 1105. The reasoning of those gun cases has been criticized by the *J.L.* Court, however, see *J.L.*, 529 U.S. at 272-73, 120 S. Ct. at 1379-80, and the majority's continued reliance on *Lamb*'s reasoning is troubling for that reason. The *Lamb* decision committed exactly the kind of expansion that the *J.L.* Court warned against by saying a firearm exception would be impossible to contain.

Used improperly, cars, guns, and a host of other instrumentalities may be dangerous to innocent people. A man carrying a concealed

weapon on a street can easily remove the weapon and fire into a group of people faster than any police officer can intercept him. A loaded and concealed weapon is a danger our courts have been concerned with for years, and it is the danger that justified the innovation of the *Terry* stop. See *id.* at 272, 120 S. Ct. at 1379. A drunk driver of a car may cause a collision with another car or with pedestrians. Both dangers are serious and cannot be taken lightly. But if an unreliable, anonymous tip about a gun does not justify a *Terry* stop, than neither does an unreliable, anonymous tip about erratic driving.[2]

Other jurisdictions interpreting the Fourth Amendment have rejected a rule that permits police to act on anonymous tips without corroboration, no matter how ridiculous, malicious, or impossible they may be. See *State v. Altieri*, 951 P.2d 866, 869 (Ariz. 1997) ("[T]he anonymous tip contained only neutral, non-predictive information about the defendant and his activities and was itself insufficient to provide reasonable suspicion for the stop. The corroboration did not sufficiently substantiate the reliability of the tip to support the investigative stop."); *People v. George*, 914 P.2d 367, 371 (Colo. 1996) (informant said possible altercation occurring in certain parking lot between van and another vehicle; corroboration of van in that lot, "a fact presumably known or knowable by everyone" was not sufficient for reasonable suspicion under *White*); *Commonwealth v. Lyons*, 564 N.E.2d 390, 393 (Mass. 1990) (finding no reasonable suspicion where anonymous call identified two white males in car carrying drugs, because "the police verified no predictive details that were not easily obtainable by an uninformed bystander"); *State v. Lee*, 938 P.2d 637, 640 (Mont. 1997) (where anonymous caller said only that she believed a person was driving under the influence and speeding, and where officer observed no irregularities consistent with impaired driving, officer lacked particularized suspicion to justify stop); *State v. Kennison*, 590 A.2d 1099, 1101-02 (N.H. 1991) (finding anonymous tip describing car, defendant's employment and predicting that defendant would return home after work and then go out again did not create reasonable suspicion where police "were unable to corroborate any of the incriminating allegations"); *State v. Guthmiller*, 499 N.W.2d 590, 591-93 (N.D. 1993) (anonymous call of "a DUI driver" in

---

[2]The concurrence's argument that *Terry* principles extend only to possessory offenses and thus not to the present case misses the point. The fundamental flaw with the stop of Vicki Boyea was that it was based on a tip that lacked sufficient indicia of reliability. We cannot apply the balancing test suggested by the concurrence to the intrusion when the stop itself is impermissible.

a blue pickup with certain license number at certain location was corroborated by police verification of description and observation of inordinately long stop at stop sign, thus stop was justified by reasonable suspicion); *Muscatell v. Cline*, 474 S.E.2d 518, 527 (W. Va. 1996) (anonymous report of light blue car traveling certain road having been involved in hit-and-run, corroborated only by seeing car but no damage, was not reasonable suspicion); *State v. Stuart*, 452 S.E.2d 886, 891-92 (W. Va. 1994) (anonymous call of drunk driving was corroborated by police finding vehicle in specified area and observing unusually slow travel; call and tip added up to reasonable suspicion); *McChesney v. State*, 988 P.2d 1071, 1077 (Wyo. 1999) ("[T]he investigating officer is required to corroborate the tip in some other fashion, usually by observing either a traffic violation or driving indicative of impairment.").

A number of federal decisions have reached the same conclusion. See, e.g., *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322-23 (10th Cir. 1998) (anonymous tip of drug distribution at certain location involving men and grey pickup, when corroborated only by observation of men and truck, did not supply reasonable suspicion); *United States v. Roberson*, 90 F.3d 75, 79 (3d Cir. 1996) (anonymous tip that described person at location and said person was selling drugs, plus corroboration of described person at location, was not reasonable suspicion as anyone could have predicted those facts).

Given the recent precedent of the United States Supreme Court and the numerous state and federal cases in accord, I would reverse.

## II.

The effect of the majority's opinion is to turn over to anyone with a telephone the power to make the government intrude into a private citizen's life without any oversight or control. The question raised by the majority's opinion is whether the social ill in this case — drunk driving — justifies its decision to curtail Fourth Amendment protection. In my view, there are two problems with this approach to Fourth Amendment jurisprudence. First, permitting a seizure based solely on an anonymous tip, without any effective requirement of reliability, abdicates the duty of the government to exercise self-restraint. It does away with the neutral review and evaluation of complaints on the criterion of "reasonableness" that is the cornerstone of the Fourth Amendment. Second, it is exactly this indiscriminate and unre-

strained power of search and seizure that the Fourth Amendment was intended to curtail.

Throughout the centuries of Anglo-American debate over search and seizure practices, reliability of information has always been a central concern. In the history of England and colonial America, the requirement of reliability was enforced in dozens of ways. Englishmen and Americans alike expressed outrage over searches based on "bare suggestion" or "surmizes," on "deceitful tattle tale" or a "bare false assertion." See W. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791 at 203, 933, 1119 (1990) (unpublished Ph.D. dissertation, Claremont Graduate School) (on file with University of Michigan Library).[3] In the centuries preceding the adoption of the Fourth Amendment, both England and the colonies increasingly insisted that accusers provide sworn statements before the government could act on the accusation. See *id.* at 667, 686-87, 836-37, 1146, 1187, 1189, 1524. Further, both England and her colonies used tort law to deter false accusations; a fruitless search was a tort for which the *informant* could be sued. See *id.* at 541, 676, 699, 700, 1196, 1220, 1532. Another safeguard against false accusations was the rule that warrants were to be granted based only on suspicion judged sufficient by a magistrate or justice of the peace and not on frivolous or malicious accusations. See, e.g., *id.* at 836, 1188, 1189, 1198, 1524.

Americans were even more aggressive in requiring reliable information before permitting searches and seizures. When the newly-minted states drafted their constitutions, several states "not only disallowed general warrants but elevated specific warrants, probable cause, and the idea of unreasonable search and seizure to a position of higher law." *Id.* at 1234. They did this by explicitly focusing on the sufficiency of suspicion. See *id.* at 1245 (Massachusetts, Maryland, and Pennsylvania Constitutions). These constitutions enshrined the understanding that the Supreme Court's decisions embody: the truthfulness or reliability of an accusation is central to whether the government may reasonably act on it.

---

[3] Justice O'Connor praised Cuddihy's work as "one of the most exhaustive analyses of the original meaning of the Fourth Amendment ever undertaken." *Vernonia School District 47J v. Acton*, 515 U.S. 646, 669 (1995) (O'Connor, J., dissenting, joined by Stevens and Souter, JJ.). Professor Maclin refers to it as "Cuddihy's monumental study of the Fourth Amendment's origins," see T. Maclin, *When the Cure for the Fourth Amendment is Worse than the Disease*, 68 S. Cal. L. Rev. 1, 15 (1994), and Professor Cloud acclaims it as "the most ambitious history of the Fourth Amendment's origins yet undertaken by a professional historian." See M. Cloud, *Searching through History; Searching for History*, 63 U. Chi. L. Rev. 1707, 1710 (1996).

As search and seizure practice evolved in the American colonies, reliability was required for warrantless procedures as well as searches or seizures based on a warrant. A Massachusetts statute required warrantless customs searches to be based on written, sworn statements describing both where the taxable goods had been smuggled and where they had been taken. See *id.* at 1291. One commentator argued that only an informant "of substantial character," speaking from direct knowledge and not vindictively motivated, could provide the basis for a search or seizure. *Id.* at 1524. Cuddihy observes that "[m]any statutes operated on similar assumptions." *Id.*

Reliability and specificity were inherent prerequisites to a reasonable search or seizure, either with warrant or without warrant, by the time the Amendment was adopted. From his twenty years of research, Cuddihy concluded that "[a]lthough the language of the amendment equates probable cause with warrants, it absorbed practices that required such cause for warrantless procedures." *Id.* at 1529. "The amendment's opposition to unreasonable intrusion, by warrant and without warrant, sprang from a popular opposition to the surveillance and divulgement that intrusion made possible." *Id.* at 1546. The unmistakable conclusion from the historical record is that Americans wanted all searches and all seizures to be based on reliable information, rather than on bald accusations by persons of unknown character.

We must therefore follow the Supreme Court's guidance and implement the Amendment by requiring the police to exercise judgment about the reliability and truthfulness of anonymous accusations of illegal conduct. As Justice Dooley has observed, we must be "concerned about giving a central place to anonymous accusations in law enforcement because we cannot know the motive of the accuser or judge the accuser's reliability." *Lamb*, 168 Vt. at 203, 720 A.2d at 1107 (Dooley, J., dissenting). Justices Stevens, Brennan, and Marshall offered a similar caution: "Anybody with enough knowledge about a given person to make her the target of a prank, or to harbor a grudge against her, will certainly be able to formulate a tip about her like the one predicting Vanessa White's excursion." *White*, 496 U.S. at 333 (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Today's majority would not even require that the accuser know anything about Vicki Boyea — they would be satisfied if someone saw her car getting on the Interstate because that person can then "predict" that her car will continue to be on the Interstate. And this

insider "prediction" justifies stopping any car because the driver might be driving drunk.[4]

The majority is eloquent about the danger of drunk driving, but public safety is not a novel concern of this century. The Framers of the Amendment lived under a system of unbridled search and seizure allegedly justified by dozens of "dangers" that evolved in the British common law and statute books. Moreover, their dangers were not so very different from ours. Searches and seizures were repeatedly used to control and confiscate weapons, from the Tudor period right through the American Revolution. See, e.g., Cuddihy, *supra*, at 99, 185, 357, 380, 439, 611, 1150. Nor is alcohol a new problem. Both sides of the Atlantic experienced searches and seizures directed at controlling alcohol consumption, see *id.* at 376, 381, 390, ·488, as well as at distilleries and breweries. See *id.* at 386, 387, 390. Drinking was not merely a moral crime but a compelling danger to the public for the American colonists. In the southern colonies, general searches were used, among other purposes, to "stop riotous drinking." *Id.* at 438. Finally, smuggling and trading with the enemy, which we perhaps do not think of as modern dangers, were among the most compelling threats to governmental authority in the century surrounding the adoption of the Amendment. Massachusetts was described in 1676 as a "'deformed anarchy,' in which annual violations of the Navigation Acts exceeded a hundred thousand pounds," *id.* at 696, and by 1776, "epidemic smuggling had eviscerated" the Massachusetts customs authority. See *id.* at 1051. In the newly-federated United States, trading with the enemy in wartime "imperiled the very survival of the state" and yet general warrants were not permitted as an instrument to control the illegal trading. *Id.* at 1279.

It was against this backdrop that the Fourth Amendment was drafted and adopted. It was in a context full of dangers that had for centuries justified a wide variety of intrusive searches and seizures. The Amendment deliberately rejected the idea that any claim to be

---

[4] I do not advocate sacrificing legitimate public safety concerns about drunk driving. Drunk driving is indeed a serious and compelling menace on our streets. I simply would require that the public safety be protected consistent with the Fourth Amendment by requiring the police to make a better showing of their basis for relying on an anonymous, unaccountable informant's accusation. We do not hamper law enforcement by requiring our police officers to produce this information. If, as the majority and concurrence suggest, the information is available to the State through caller identification or enhanced 911 systems, then the police already have all the information they need to show that they relied on an objectively reliable tip. They should simply be required to come forward with that information to support their actions.

acting for public safety necessarily justified promiscuous search and seizure powers. The Constitution protects privacy against the fears and anxieties of the moment; it forces the State to act cautiously, even slowly, despite the risks entailed. As Professor Steiker observed, "[i]ndividual liberties entail social costs. . . . Nowhere is this more true than with the Fourth Amendment. . . . Particularly in times of rampant violent crime or other serious threats to security, the inhibiting power of the Fourth Amendment can seem 'too extravagant to endure.'" C. Steiker, *Second Thoughts About First Principles*, 107 Harv. L. Rev. 820, 820 (1994) (citation omitted). As she points out, the claimants of the Fourth Amendment's protections often "appear less than sympathetic." *Id.* at 820-21. It was for this very reason that the proponents of the Bill of Rights insisted that those rights be enshrined in the Constitution and set out of the reach of political tides. In submitting the amendments to Congress, Madison "declared that, since tyranny originated at the locus of power, a government based on popular consent would be more likely to become the majority's instrument for oppressing the minority than the reverse. . . . [Thus,] the right against unreasonable search and seizure was intended to restrain 'the body of the people operating by the majority against the minority.'" Cuddihy, *supra*, at 1473-74. As Professor Strossen put it, "[t]he Bill of Rights itself manifests the Framers' considered judgment that the rights it guarantees presumptively, if not conclusively, outweigh the competing societal concerns in all cases." N. Strossen, *The Fourth Amendment in the Balance: Accurately Setting the Scales Through the Least Intrusive Alternative Analysis*, 63 N.Y.U. L. Rev. 1173, 1186 (1988). The Amendment is designed not to collapse at the cry of "public safety" but to hold the government to a requirement of reasonableness even when the government argues it is acting for public safety. It is the inherent nature of police work to deal with dangerous situations; if danger becomes a justification for dispensing with the requirement of reliability, then there will be nothing left of the Fourth Amendment.

I am authorized to state that Justice Dooley joins in this dissent.