# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3457

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa |
| Wade Allen Wheat, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  April 10, 2001
Filed: December 28, 2001 (Corrected: 01/04/02)

_____

Before LOKEN, Circuit Judge, BOGUE,[1] District Judge, and GOLDBERG,[2] Judge.[3]

_____

GOLDBERG, Judge.

_____

[1]  The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

[2]  The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

[3]  Pursuant to 28 U.S.C. § 46(b), the Chief Judge certified the existence of a judicial emergency necessitating the designation of a panel consisting of fewer than two members of the Court of Appeals.

Wade Allen Wheat appeals from his conviction on one count of possession of cocaine base ("crack"). He argues, inter alia, that the district court[4] erred in denying his motion to suppress, and that, even if his conviction were lawful, his sentence is unconstitutional in light of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). Because we find that the District Court properly denied Wheat's motion to suppress and that the Apprendi error was harmless, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On May 3, 1996, a motorist used his cellular phone to place a 9-1-1 call to the Blairsburg, Iowa Police Department. The caller reported that a tan- and cream-colored Nissan Stanza or "something like that," whose license plate began with the letters W-O-C, was being driven erratically in the northbound lane of Highway 169, eight miles south of Fort Dodge, Iowa. The caller complained that the Nissan was passing on the wrong side of the road, cutting off other cars, and otherwise being driven as if by a "complete maniac." The 9-1-1 operator did not ask the caller to identify himself.

Police dispatchers relayed the caller's tip to patrolling officers. Shortly thereafter, Officer Paul Samuelson observed a tan Nissan Maxima whose license plate began with the letters W-O-C, stopped in the northbound lane of Highway 169 at the intersection of Highway 20. The Nissan made a right turn, and Officer Samuelson stopped it immediately, without having observed any incidents of erratic driving. He obtained the driver's licenses of the driver and Wheat, who was sitting in the front passenger seat; there were no other passengers. A check disclosed that Wheat's license was suspended but that notice of the suspension had

_____

[4] The Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa.

never been served. Because Officer Samuelson was unfamiliar with the procedure for service, he radioed Officer Aaron Anderson, whom he already had an appointment to meet, to request assistance at the scene.

Shortly after Officer Anderson arrived, a dispatcher radioed Officer Samuelson to inform him that the suspension had in fact already been served. However, because Officer Samuelson had noticed that the driver's hands were fidgeting, he asked Officer Anderson whether he had any previous experience with the driver. Officer Anderson told Officer Samuelson that the driver had a history of drug problems and that he had run from the police on several occasions. On the basis of this information, and after informing Wheat that the suspension did not need to be served, Officer Samuelson requested and received permission from the driver to search the vehicle. At Officer Samuelson's request, the driver exited the vehicle.

As Officer Samuelson was walking around toward the passenger side, Wheat opened his door and exited the vehicle on his own initiative. When Officer Samuelson reached the passenger side, he noticed a dry brown paper bag from a McDonald's restaurant at Wheat's feet. Because it was raining during the duration of the stop, the dryness of the bag was remarkable. Suspecting that Wheat had just discarded the bag, Officer Samuelson retrieved it, and found that it held four smaller plastic bags containing what appeared to be a controlled substance. A further search of the vehicle also revealed a small quantity of marijuana. Around fifteen minutes after he first pulled them over, Officer Samuelson arrested both the driver and Wheat for possession of controlled substances. Subsequent laboratory testing proved the contents of the plastic bags to be 63.03 grams of crack cocaine.

Wheat was indicted by a grand jury on one count of possession with intent to distribute more than 50 grams of a mixture or substance containing cocaine base, in violation of 21 U.S.C. § 841(b)(1)(A)(iii) (1994). He pled not guilty and

filed a motion to suppress all evidence obtained and statements made at the May 3, 1996 vehicle stop. The motion was denied.

In a two-day jury trial beginning March 10, 1997, the appellant was found not guilty of possession with intent to distribute, but was convicted on the lesser included offense of simple possession of cocaine base, pursuant to 21 U.S.C. § 844(a). The district court sentenced the appellant to 110 months imprisonment. After several procedural twists and turns not relevant to the issues before us now, this appeal followed.

## II.   DISCUSSION

Wheat's principal contentions are that the district court erred by denying his motion to suppress all evidence obtained as a result of the May 3, 1996 stop of the vehicle in which he was a passenger, and, failing the success of that argument, that his 110-month sentence is unconstitutional in light of the Supreme Court's subsequent decision in Apprendi v. New Jersey, 530 U.S. 466 (2000).

## A.   The District Court Properly Denied the Motion to Suppress

We conduct a de novo review of the district court's denial of the motion to suppress. Ornelas v. United States, 517 U.S. 690, 699 (1996). However, we review the findings of historical fact that underlie the district court's decision for clear error, and afford "due weight" to the inferences drawn from those facts by the district court and the participating law enforcement officers. Id.; see also United States v. Ball, 90 F.3d 260, 262 (8th Cir. 1996).

Wheat argues that the anonymous 9-1-1 call could not give rise to reasonable suspicion sufficient to justify an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), because Officer Samuelson never witnessed any traffic

violation actually in progress or about to occur. Wheat also argues that he and the driver of the Nissan should have been allowed to leave the scene immediately after Officer Samuelson discovered that no license suspension needed to be served.[5]

1.    Officer Samuelson Had Reasonable Suspicion to Initiate the Stop

When a law enforcement officer directs a motor vehicle to stop by the side of the road and detains its occupants for questioning, such an investigatory stop constitutes a search and seizure under the Fourth and Fourteenth Amendments, "even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979); accord Whren v. United States, 517 U.S. 806, 809-10 (1996); see also Thomas v. Dickel, 213 F.3d 1023, 1024 (8th Cir. 2000). Under Terry and its progeny, "[a]n investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion." Ornelas v. United States, 517 U.S. 690, 693 (1996); see also United States v. Sharpe, 470 U.S. 675, 682 (1985) (applying Terry to investigatory stop of vehicle); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999) ("An investigative stop does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity."). If the investigatory stop is not justified by reasonable suspicion or if the investigating officers exceed the stop's proper scope, any evidence derived from the stop is inadmissible at trial. See, e.g., Wong Sun v. United States, 371 U.S. 471, 484 (1963); United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994). A passenger in a motor vehicle has standing to challenge the stop of that vehicle. See United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

---

[5] Before this Court, Wheat does not suggest, as he did before the district court, that the search of the paper McDonald's bag was unlawful. As the government nonetheless takes the trouble to argue in its brief to the Court, such an argument would fail, as Wheat had no legitimate expectation of privacy in the surface of the pavement near his car. United States v. Dawdy, 46 F.3d 1427, 1430 (8th Cir. 1995).

Because reasonable suspicion is a less demanding standard than the probable cause required for an arrest, it "can arise from information that is less reliable than that required to show probable cause," including an anonymous tip. Alabama v. White, 496 U.S. 325, 330 (1990). Whether an anonymous tip suffices to give rise to reasonable suspicion depends on both the quantity of information it conveys as well as the quality, or degree of reliability, of that information, viewed under the totality of the circumstances. Id. "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Id.

In White, the Supreme Court considered whether the requisite quantum of suspicion was established by an anonymous tip claiming that a named individual would leave a specific apartment at a particular time and transport an ounce of cocaine in a brown Plymouth station wagon with a broken tail light to a specific motel. Id. at 327. The Court stated that the tip itself provided virtually no indication that the caller was honest or that the tip was reliable, as it gave no basis for its predictions. Id. at 329. However the Court held that visual corroboration by law enforcement officers of most aspects of the tip, including the suspect's sex, the time of her departure, the vehicle she drove, and her apparent destination, gave the tip sufficient indicia of reliability. Id. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.").

Subsequent to White, with respect to two categories of anonymous tips, lower courts tended to find reasonable suspicion even where such tips lacked personal corroboration by law enforcement officers of any predictive elements. First, several federal appellate courts held that verification by police of the innocent details of a tip, such as the suspect's description, could amount to reasonable suspicion when the principal allegation of the tip was that the suspect

was armed with a gun and presented a potentially immediate danger. See, e.g., United States v. Clipper, 973 F.2d 944, 946-51 (D.C. Cir. 1992); United States v. Bold, 19 F.3d 99, 102-04 (2d Cir. 1994); United States v. DeBerry, 76 F.3d 884, 885-87 (7th Cir. 1996); United States v. Gibson, 64 F.3d 617, 619-25 (11th Cir. 1995); see also United States v. Roberson, 90 F.3d 75, 81 n.4 (3d Cir. 1996) (speculating in dicta that "a different rule may apply" if an anonymous tip alleged that the suspect possessed a weapon rather than drugs). The courts agreed that the suspect's alleged possession of a firearm was an important factor to be considered in weighing the totality of the circumstances, because the "element of imminent danger distinguishes a gun tip from one involving possession of drugs." Clipper, 973 F.2d at 951; accord DeBerry, 76 F.3d at 886 ("Armed persons are so dangerous to the peace of the community that the police should not be forbidden to follow up a tip that a person is armed, and as a realistic matter this will require a stop in all cases."); Bold, 19 F.3d at 104; Gibson, 64 F.3d at 624. The courts recognized that "an officer who corroborates every item of information reported by an anonymous tipster other than actual possession is left with an unappealing choice. He must either stop and frisk the individual, or wait to see if he ultimately brandishes or uses the firearm." Gibson, 64 F.3d at 624 (internal quotation marks and citations omitted) (citing Clipper, 973 F.2d at 951).

The second category of tips for which courts declined to require corroboration of their predictive elements concerned a different type of potentially immediate threat, and the one at issue in this case: an apparently drunk or reckless driver. Thus, a number of state supreme and intermediate appellate courts[6] held that law enforcement officers could pull over a vehicle for an investigatory stop based on a contemporaneous tip of erratic driving that accurately described a

---

[6] Presumably because traffic violations are adjudicated in state rather than federal court, there is a paucity of reported federal court decisions concerning Fourth Amendment challenges to Terry stops based on anonymous tips of erratic driving.

-7-

given vehicle, even where the officer did not personally witness any moving violations and therefore lacked probable cause to make an arrest. See, e.g., State v. Melanson, 140 N.H. 199, 200-03, 665 A.2d 338, 339-41 (1995); State v. Sampson, 669 A.2d 1326, 1327 (Me. 1996); State v. Lamb, 168 Vt. 194, 196-203, 720 A.2d 1101, 1102-06 (1998); State v. Slater, 267 Kan. 694, 696-706, 986 P.2d 1038, 1041-46 (1999); see also State v. Markus, 478 N.W.2d 405 (Iowa Ct. App. 1991); State v. Smith, 638 N.E.2d 1353 (Ind. Ct. App. 1994); People v. Rance, 644 N.Y.S.2d 447, 227 A.D.2d 936 (N.Y. App. Div. 1996); Kaysville City v. Mulcahy, 943 P.2d 231 (Utah Ct. App. 1997). But see McChesney v. State, 988 P.2d 1071, 1075-78 (Wyo. 1999) (3-2 decision) (holding that corroboration only of color, make, and direction of suspect vehicle anonymously reported to be weaving and dangerously passing other cars did not give rise to reasonable suspicion where officer did not personally witness erratic driving after trailing vehicle a substantial distance); State v. Miller, 510 N.W.2d 638, 640-45 (N.D. 1994) (holding that tip that driver in fast-food restaurant's drive-up lane "could barely hold his head up" and was possibly drunk could not create reasonable suspicion because it was "short on reliability, . . . short on specifics," and uncorroborated by police officer); State v. Lee, 282 Mont. 391, 393-96, 938 P.2d 637, 638-40 (1997) (holding that anonymous caller's "belief" that driver was under influence of alcohol and was speeding, without any indication that the caller's belief was based on personal observation of drinking, speeding, or erratic driving, did not justify investigatory stop); see also State v. Villegas-Varela, 132 Or. App. 112, 114-19, 887 P.2d 809, 810-13 (1994) (holding that anonymous tip that did not give location or direction of suspect car that was ultimately not stopped until more than an hour later did not give rise to reasonable suspicion). In addition to the fact that in the erratic driving context the tipster is almost invariably claiming to describe contemporaneously perceived behavior, see, e.g., Melanson, 140 N.H. at 202, 665 A.2d at 340, courts tended to agree that, as in the gun possession cases, the exigency of the situation demanded an immediate law enforcement response. See, e.g., id. at 203, 665 A.2d at 340.

Last year, however, the Supreme Court appeared to curtail the argument that a purported threat of imminent danger necessarily lessens the government's burden in an analysis of the reliability of an anonymous tip.  In <u>Florida v. J.L.</u>, 529 U.S. 266 (2000), a decision not cited by the parties to the instant case, the Court considered whether an anonymous tip that a person is carrying a gun is sufficient to justify a <u>Terry</u> stop and frisk.  An anonymous caller had reported that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun; the caller did not identify himself or explain whence he knew such information.  <u>Id.</u> at 268, 271.  Police officers responding to the call spotted a young black male in a plaid shirt at the designated bus stop and, though they saw no firearm and had no reason to suspect the individual or his companions of illegal conduct, nevertheless stopped and frisked him, seizing a gun.  <u>Id.</u> at 268.

A unanimous Court held that the stop-and-frisk was unconstitutional, as "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about" the suspect lacked even the "moderate indicia of reliability present in <u>White</u>."  <u>Id.</u> at 271.  The Court expressly rejected both the argument that the officers' confirmation of the suspect's visual attributes provided sufficient corroboration of the tip, <u>id.</u> at 271-72, and the argument that an "automatic firearm exception" should apply to the standard <u>Terry</u> analysis.  <u>Id.</u> at 272.  While recognizing the danger posed by firearms, the Court expressed its fears that an automatic exception would facilitate harassment based on false tips, and that a similar exception would be claimed for "bare-boned tips about narcotics," since those who possess large quantities of drugs are frequently assumed to be armed.  <u>See id.</u> at 272-73.  At the same time, the Court declined

> to speculate about the circumstances under which the danger alleged
> in an anonymous tip might be so great as to justify a search even
> without a showing of reliability.  We do not say, for example, that a
> report of a person carrying a bomb need bear the indicia of reliability

we demand for a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officers in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports and schools, cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.

Id. at 273-74 (citations omitted).

The question we now face is whether, in light of J.L., an anonymous tip about the dangerous operation of a vehicle whose innocent details are accurately described may still possess sufficient indicia of reliability to justify an investigatory stop by a law enforcement officer who does not personally observe any erratic driving. Recognizing the complexity of this issue, we answer affirmatively, and hold that under the totality of the circumstances of this case, Officer Samuelson had reasonable suspicion to detain the car in which Wheat was a passenger.

In reaching this conclusion, we have been influenced by the reasoning employed by those state courts that have already considered the issue. The Supreme Courts of Vermont, Iowa, and Wisconsin have held that J.L. does not prevent an anonymous tip concerning erratic driving from acquiring sufficient indicia of reliability to justify a Terry stop, even when the investigating officer is unable to corroborate that the driver is operating the vehicle recklessly and therefore unlawfully.

In the first such decision by a state high court, State v. Boyea, 765 A.2d 862 (Vt. 2000), cert. denied, 121 S. Ct. 2524 (2001), the Supreme Court of Vermont affirmed by a 3-2 vote the denial of a motion to suppress where the investigating officer's sole initial basis for detaining the motorist was an anonymous tip, relayed by a police dispatcher, describing a "blue-purple Volkswagen Jetta with New York

-10-

plates, traveling south on I-89 in between Exits 10 and 11, operating erratically." Id. at 863, 868. Although the court admitted that the case was close, see id. at 867 n.7, it distinguished J.L. on several grounds. First, it stated that the informant's accurate description of the vehicle and correct prediction of its location, just minutes before the stop, gave the tip greater reliability than the bare-bones tip in J.L. Second, the court observed that "[i]n contrast to the report of an individual in possession of a gun, an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action." Id. at 867. The court noted that whereas police confronted with a report of a concealed gun could quietly observe the suspect "for a reasonable period of time without running the risk of death or injury with every passing moment[, a]n officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury." Id. Thus, such a driver is not unlike the "bomb" for which, as the Supreme Court suggested in J.L., a laxer standard of reliability may apply. Id. Finally, the court reasoned that the liberty interest implicated by a simple motor vehicle stop was weaker than the "hands-on violation of the person" that occurred in J.L.. Id. at 868.

A very similar analysis informed the decision of the Supreme Court of Iowa in State v. Walshire, 634 N.W.2d 625 (Iowa 2001). The court found that because a tip about erratic driving describes not concealed criminal activity, as in J.L., but rather "illegality open to public observation," it therefore "demonstrated the tipster's basis of knowledge" and its reliability could be demonstrated through corroboration of innocent details. Id. at 627-28. Unlike the unknown informant in J.L., who "neither explained how he knew about the gun nor supplied any basis for believing he had inside information," 529 U.S. at 271, the caller in Walshire made it clear that he or she was a private citizen eyewitness to an ongoing crime. 634 N.W.2d at 629. The court also agreed with the Boyea court that the imminent danger of drunk driving "might call for a relaxed threshold of reliability," and that

the intrusion on privacy interests is slight in a vehicle stop as compared to a pat-down on a public street.  Id. at 630.

The Supreme Court of Wisconsin has also upheld an investigatory stop of a vehicle based on an anonymous tip alleging erratic driving, albeit under somewhat stronger factual circumstances.  In State v. Rutzinski, 241 Wis. 2d 729, 623 N.W.2d 516 (2001), the court considered the reliability of the tip provided by an unidentified motorist calling from a cell phone, contemporaneously describing a black pickup truck that was weaving within its lane, variously driving too fast or too slow, and tailgating.  Id. at 733, 623 N.W.2d at 519.  Although the investigating officer did not personally observe any such erratic driving, id. at 734, 623 N.W.2d at 519, the court affirmed the denial of the motion to suppress, on three grounds.  First, the court found that although the caller was never identified, he or she did indicate during the phone tip that he or she was in the car directly in front of the offending vehicle, and would therefore have been aware of the possibility that the police could have traced his or her identity by recording his or her license plate number.  Id. at 747, 623 N.W.2d at 525.  Next, the court recognized that the caller explained that "he or she was making personal observations of the [suspect driver's] contemporaneous actions," unlike the caller in J.L..  Id. at 748, 623 N.W.2d at 526.  Finally, like the Boyea court, the court acknowledged that the tip in question suggested that the suspect "posed an imminent threat to the public's safety."  Id. at 748-49, 623 N.W.2d at 526.  The court emphasized that it did not advocate a blanket exception to the reliability requirement for tips concerning alleged drunk driving, but at the same time clearly stated that the "extraordinary danger" of drunk driving meant that any allegation thereof had to be seriously considered in weighing the totality of the circumstances.  Id. at 751, 623 N.W.2d at 527.

A handful of lower state courts to have considered this issue in light of J.L. have reached a different conclusion, however.  In Commonwealth v. Lubiejewski,

49 Mass App. Ct. 212, 729 N.E.2d 288 (2000), a Massachusetts appeals court held that an anonymous cellular phone call claiming that a pickup truck had been driving on the wrong side of the road could not justify an investigatory stop. Id. at 213-17, 729 N.E.2d at 290-93. Although the trooper had corroborated all the innocent details about the truck, including its license plate number, he had not personally witnessed any erratic driving, and the caller had already told the dispatcher that the truck had returned to the correct side of the road, so "the emergency had ended." Id. at 215, 729 N.E.2d at 292. In State v. Boyle, 793 So.2d 1281 (La. Ct. App. 2001), a divided Louisiana appeals court held that an anonymous tip that the driver of a particular pick-up truck was intoxicated did not justify a Terry stop of the suspect in his own driveway. Id. at 1284-85. The court focused on the fact that the officers had not witnessed any criminal activity or unusual driving, and on the fact that the stop took place on the suspect's private property. Id. at 1284. In Washington v. State, 740 N.E.2d 1241 (Ind. Ct. App. 2001), an Indiana appeals court reversed the denial of a motion to suppress marijuana seized during an investigatory stop of a vehicle made pursuant to anonymous tip that the driver was possibly drunk, because the officer had not personally observed any dangerous driving during the two miles he followed the car, and had not corroborated any detailed predictions of the suspect's future behavior. Id. at 1243-1246. And in Stewart v. State, 22 S.W.3d 646 (Tex. Ct. App. 2000), a Texas appeals court held that an anonymous tip that a driver had appeared highly intoxicated while entering the vehicle did not justify a stop, because the description of the suspect was so general that the court questioned whether the officer was certain he had stopped the correct suspect, and the officer had not witnessed any erratic driving. Id. at 648-50. However, in State v. Marks, 2000 WL 33298878 (Conn. Super. Ct. Dec. 7, 2000), a Connecticut trial court denied a motion to suppress a stop based on an anonymous tip of erratic driving, even though the officer witnessed no unlawful driving and the tipster refused to identify himself, because the tip took the form of a five-minute 9-1-1 call wherein the caller "clearly relay[ed] his first hand observations as events [we]re unfolding

-13-

before him," describing in extensive detail "every erratic move" of the suspect's car.  Id. at *5.

From these cases, and upon further reflection, we believe the following considerations to be integral to a determination of whether an anonymous tip of erratic driving may justify an investigatory stop.  In so doing, we bear in mind the Supreme Court's instruction that "[r]easonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors--quantity and quality--are considered in the 'totality of the circumstances.'"  White, 496 U.S. at 330 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

First, the anonymous tipster must provide a sufficient quantity of information, such as the make and model of the vehicle, its license plate numbers, its location and bearing, and similar innocent details, so that the officer, and the court, may be certain that the vehicle stopped is the same as the one identified by the caller.  The time interval between receipt of the tip and location of the suspect vehicle, though going principally to the question of reliability, may also be a factor here.  Although the J.L. Court focused on deficiencies in the quality, rather than in the quantity, of the information contained in the tip at issue in that case, we think it significant that that tip only spoke of a young black male wearing a plaid shirt, standing at a particular bus stop.  See J.L., 529 U.S. at 268.  That is a rather generic description, and the possibility for confusion of the suspect's identity was compounded by the fact that the police only responded "sometime" later; the record did not disclose how long.  Id.  By contrast, in the instant case, the caller identified the color and make of the vehicle, named the first three letters of its license plate, and gave its location and direction.[7]  Compare Boyea, 765 A.2d at

_____

[7] Although the caller misidentified the model of the vehicle as a Stanza, rather than as a Maxima, he expressed reservation, saying that it was "something like that." In all other respects his identification of the vehicle was correct.

-14-

863 (caller accurately described a "blue-purple Volkswagen Jetta with New York plates, traveling south on I-89 in between exits 10 and 11"), with Stewart, 22 S.W.3d at 649 ("[G]iven the generality of the radioed description, it is not clear that the officer could even be sure that the automobile was being driven by the man seen to [appear drunk] by the informer."). See also Terry, 392 U.S. at 21 n.18 ("Th[e] demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). Officer Samuelson effected a stop within minutes of the 9-1-1 call, and at the suppression hearing, he testified that he "knew right away that that was the vehicle." Tr. of Hr'g on Mot. to Suppress, at 20. We think that the information in the tip identifying the recklessly driven vehicle was sufficiently copious and precise.

The tip must also contain a sufficient quantity of information to support an inference that the tipster has witnessed an actual traffic violation that compels an immediate stop.[8] A law enforcement officer's mere hunch does not amount to reasonable suspicion, see Terry, 392 U.S. at 27; Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000); a fortiori, neither does a private citizen's. Cf. Miller, 510 N.W.2d

---

[8] The rationale for allowing less rigorous corroboration of tips alleging erratic driving is that the imminent danger present in this context is substantially greater (and more difficult to thwart by less intrusive means) than the danger posed by a person in possession of a concealed handgun. Therefore, the moving violation or violations alleged must suggest real exigency. An allegation of erratic driving will generally pass this test since it strongly suggests that the driver is operating under the influence of alcohol or drugs and is unable to control his vehicle. So too would an anonymous tip of drag racing or a game of "chicken"; at the other end of the spectrum, a report of a vehicle being driven one mile per hour over the posted limit would almost certainly not. But we need not delimit the offenses that might give rise to reasonable suspicion, and indeed we cannot, for the inquiry must always be undertaken on a case-by-case basis under the totality of the circumstances. In all cases, however, the more extensive the description of the alleged offense, the greater the likelihood that the tip will give rise to reasonable suspicion.

at 640-45 (holding that tip that driver in fast-food restaurant's drive-up lane "could barely hold his head up" and was possibly drunk could not create reasonable suspicion in part because it was "short on specifics"); <u>Lee</u>, 282 Mont. at 393-96, 938 P.2d at 638-40 (holding that anonymous caller's "belief" that driver was under influence of alcohol and was speeding, without any indication that the caller's belief was based on personal observation of drinking, speeding, or erratic driving, did not justify investigatory stop). In the instant case, the anonymous caller specifically alleged that he had personally observed several different traffic violations involving erratic driving. <u>See</u> Iowa Code §§ 321.299 <u>et seq.</u> (2001) (regulating proper methods of passing and overtaking another vehicle); Iowa Code § 321.277 (2001) (making reckless driving a simple misdemeanor).

The second and far more difficult consideration concerns the quality, or degree of reliability, of the information conveyed in an anonymous tip. In <u>J.L.</u>, the Court found the anonymous tip unreliable because it "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." 529 U.S. at 271. In the context of an anonymous tip of erratic driving, however, the first challenge is to identify the predictive element of the tip that must be corroborated. Is it that the vehicle is being driven dangerously? Wholly aside from the public safety considerations discussed <u>infra</u>, this seems too stringent, because a police officer who corroborated the claim of reckless driving would then have not merely reasonable suspicion to justify an investigatory stop, but probable cause to make an arrest. <u>See</u> <u>United States v. Bell</u>, 86 F.3d 820, 822 (8th Cir. 1996) ("[A]ny traffic violation, even a minor one, gives an officer probable cause to stop the violator."); <u>accord</u> <u>United States v. Neumann</u>, 183 F.3d 753, 755-56 (8th Cir. 1999); <u>see also</u> Iowa Code § 321.277. Thus, police would lose the intermediate step of investigatory stops based on reasonable suspicion. We think that under the proper circumstances <u>Terry</u> stops strike a careful balance between society's interest in crime prevention and the individual

citizen's interest in remaining free from wanton government interference, and we are loath to see their use foreclosed in this context.[9]

Alternatively, the predictive information to be corroborated might be no more than that a vehicle matching a certain description will pass a certain waypoint on a specific road at an approximate time. However, the Supreme Court precluded this approach in J.L., at least with respect to gun possession cases. While acknowledging that corroboration of the suspect's "readily observable location and appearance" does assure that the police have stopped the person that the tipster meant to accuse, the Court stated that "[s]uch a tip . . . does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L., 529 U.S. at 272.[10]

_____

[9] Under Iowa law, a peace officer who has probable cause to believe a traffic violation has been committed may, at her discretion, make a full-blown custodial arrest of the suspect. See Iowa Code § 321.485(1)(a) (2001). A constitutional scheme that absolutely forbade peace officers from immediately stopping a vehicle reported to be dangerous, in order to ask a few questions of the driver, but encouraged them to watch that same vehicle like hawks for the slightest violation of any of the manifold motor vehicle regulations, and thereupon permitted them to make a full custodial arrest, would do no service to individual liberties. Officers would have incentive to issue citations or make arrests for very minor moving violations they might otherwise overlook, in order to have some pretext to get a reportedly drunk driver off the road. To do so would be perfectly constitutional, see Whren v. United States, 517 U.S. 806, 813 (1996), yet not something that we think the courts should encourage.

[10] Curiously, however, in White, which formed a cornerstone of the analysis in J.L., none of the predictive information corroborated proved that the tipster had knowledge of concealed criminal activity, a fact not lost on the dissent or on other commentators. See White, 496 U.S. at 333 (Stevens, J., dissenting) ("An anonymous neighbor's prediction about somebody's time of departure and probable destination is anything but a reliable basis for assuming that the commuter is in possession of an

A careful reading of the Supreme Court's Fourth Amendment jurisprudence suggests that this emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal actions, as in the case of erratic driving witnessed by another motorist. White did not create a rule requiring that a tip predict future action, United States v. Johnson, 64 F.3d 1120, 1125 (8th Cir. 1995), and neither did J.L.. As we have previously acknowledged, "[s]uch a rule would be contrary to the line of cases holding that reasonable suspicion must be judged on the totality of the circumstances." Id. at 1125 n.3. The Supreme Court has long emphasized that a primary determinant of a tipster's reliability is the basis of his knowledge. See Illinois v. Gates, 462 U.S. 213, 230 (1983) ("[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report. . . . [T]hese elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . . Rather, . . . they should be understood simply as closely intertwined issues."); accord White, 496 U.S. at 328-29. Unlike with clandestine crimes such as possessory offenses, including those involving drugs or guns, where corroboration of the predictive elements of a tip may be the only means of ascertaining the informant's basis of knowledge, in erratic driving cases the basis of the tipster's knowledge is likely to be apparent. Almost always, it comes from his eyewitness observations, and there is no need to verify that he possesses inside information. As the court reasoned in Boyea:

> The offense alleged here did not involve a concealed crime--a
> possessory offense. What was described in the police dispatch to the

---

illegal substance."); 4 La Fave, Search and Seizure § 9.4(h), at 224-25 (3d ed. 1996) (criticizing the majority opinion for crediting "'the caller's ability to predict respondent's future behavior,' even when . . . that behavior--as far as the surveilling officers can tell--is both routine and nonsuspicious") (emphasis in original; footnotes deleted).

-18-

arresting officer was a <u>crime in progress</u>, carried out in public, identifiable and observable by anyone in sight of its commission. Unlike the tip alleged in <u>White</u>--that White was carrying narcotics-- . . . here a total stranger could have observed defendant's driving abilities. No intimate or confidential relationship was required to support the accuracy of the observation. The caller simply reported a contemporaneous observation of criminal activity taking place in his line of sight.

765 A.2d at 875 (Skoglund, J., concurring) (emphasis in original). <u>See also</u> <u>Walshire</u>, 634 N.W.2d at 627-28 ("[T]he information provided here did not concern concealed criminal activity, but rather illegality open to public observation. The tip here demonstrated the tipster's basis of knowledge: the caller observed the defendant driving in an erratic manner."); <u>Rutzinski</u>, 241 Wis. 2d at 748, 623 N.W.2d at 526 ("Unlike the caller in <u>J.L.</u>, the informant in this case provided the police with verifiable information indicating his or her basis of knowledge. The informant explained that he or she was making personal observations of Rutzinski's contemporaneous actions."). <u>Cf.</u> <u>United States v. Armstead</u>, 112 F.3d 320, 322 n.3 (8th Cir. 1997) (rejecting contention that anonymity of airline agent made his or her tip about a drug courier unreliable, as "[t]he exact identity of the airline's agent is unimportant: it is enough that she or he worked for the airline, . . . and would therefore have accurate information").

By way of contrast, in <u>White</u> corroboration of the predictive aspects of the tip was the <u>only</u> means of confirming the tipster's basis of knowledge. <u>See</u> 496 U.S. at 332 ("[T]he caller's ability to predict respondent's <u>future behavior</u> . . . demonstrated inside information . . . [that t]he general public would have had no way of knowing . . . . [A] person with access to [information about an individual's itinerary] is likely to also have access to reliable information about that individual's illegal activities.") (emphasis in original). And in <u>J.L.</u>, the tip lacked any predictive elements that would suggest the tipster was in a special position to know about the suspect's clandestine lawbreaking. 529 U.S. at 271 ("All the

-19-

police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information."). Although the tipster did provide an ostensibly contemporaneous account of the suspect's actions, inasmuch as he stated that the suspect was standing at a certain bus stop, he neither alleged that he was observing any crime nor even explained how he knew that the suspect carried a gun. See id. at 272 ("[The tip in question] does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality . . . ."). We think that an anonymous tip conveying a contemporaneous observation of criminal activity whose innocent details are corroborated is at least as credible as the one in White, where future criminal activity was predicted, but only innocent details were corroborated.[11]

We recognize the danger that, as with any anonymous tip, even a supposedly contemporaneous account of erratic driving could be a complete work of fiction, created by some malicious prankster to cause trouble for another motorist. Indeed, in J.L. the Supreme Court declined to adopt an automatic firearm exception to the corroboration requirement for this very reason. See 529

---

[11] Significantly, in our common law contemporaneous accounts of situations have long been regarded as especially credible, and thus exempt from the hearsay rule as present sense impressions, one aspect of the concept of res gestae. See Jon R. Waltz, The Present Sense Impression Exception to the Rule Against Hearsay: Origins and Attributes, 66 Iowa L. Rev. 869, 870-75 (1981) (explaining that this principle is not, as often assumed, of recent origin, but rather dates back centuries). This exception is of course now codified at Fed. R. Evid. 803(1) (excluding from the hearsay rule "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition," regardless whether the declarant is available as a witness). Although the declarant must have been a percipient witness, i.e., "one who was in a position to perceive the event or condition which his declaration purports to describe," he need not be identified so long as there is no doubt that a declaration was actually made. Waltz, 66 Iowa L. Rev. at 877-78.

U.S. at 272.  However, with respect to anonymous reports of erratic driving that seem otherwise credible under the totality of the circumstances, we think that the risk of false tips is slight compared to the risk of not allowing the police immediately to conduct an investigatory stop, for several reasons.

First, the risk that law enforcement officers themselves will fabricate such a tip in order to harass innocent motorists is negligible.  Where, as in this case, the tip originates in the form of a 9-1-1 call, and is subsequently broadcast over the police radio channel, there is no chance that the investigating officer has invented the tip, a fear expressed in other circumstances by some commentators.  See, e.g., 4 La Fave, Search and Seizure § 9.4(h), at 227 (criticizing the Supreme Court's decision in Adams v. Williams, 407 U.S. 143 (1972), where the Court upheld an investigatory stop based on a tip allegedly provided by informant known to officer but otherwise never identified, on the grounds that it facilitates police fabrications).  That leaves the possibility of malicious hoaxes perpetrated by private citizens.  We wholeheartedly endorse efforts such as those mentioned by Justice Kennedy in his concurrence in J.L., see 529 U.S. at 276, to encourage law enforcement to use instant caller identification technology or otherwise to try to identify anonymous tipsters, in order to increase the reliability of such tips.  In the instant case, however, we confront a situation where the 9-1-1 operator failed to ask the caller for his identity, and the caller did not volunteer such information.

We must therefore decide whether that oversight, and the consequent possibility that the allegation of erratic driving was groundless, destroyed the reliability of the tip in question.  From Terry, we know that

> [i]n order to assess the reasonableness of Officer [Samuelson's] conduct as a general proposition, it is necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen, for there is no ready test for determining reasonableness other than by

-21-

> balancing the need to search [or seize] against the invasion which the search [or seizure] entails.

Terry, 392 U.S. at 20-21 (initial brackets added; subsequent brackets in original; internal quotation marks deleted).  In cases of possible drunk driving, we think that the governmental interest in effecting an immediate investigatory stop is very strong, and the intrusion upon the constitutionally protected interests of the private citizen, although also significant, is comparatively less so.

An erratic and possibly drunk driver poses an imminent threat to public safety.  See Rutzinski, 241 Wis. 2d at 748-51, 623 N.W.2d at 526-27.  Of course, arguably so too does a citizen armed with a gun, yet the Supreme Court firmly declined to adopt an automatic firearm exception to the reliability requirement on that basis.  J.L., 529 U.S. at 272.  However, there is a critical distinction between gun possession cases and potential drunk driving cases.  In the possessory offense cases, law enforcement officers have two less invasive options not available to officers responding to a tip about a drunk driver.  First, they may initiate a simple consensual encounter, for which no articulable suspicion is required.  See Florida v. Rodriguez, 469 U.S. 1, 5-7 (1984) (per curiam).  Needless to say, that is not possible when the suspect is driving a moving vehicle.[12]

Alternatively, officers responding to a tip about a possessory violation may quietly observe the suspect for a considerable length of time, watching for other indications of incipient criminality that would give them reasonable suspicion to make an investigatory stop--as, for example, in Terry, where an experienced officer witnessed several men casing a joint. 392 U.S. at 5-7.  By contrast, where an anonymous tip alleges erratic and possibly drunk driving, a responding officer

---

[12]  We do not suggest that the impracticality of conducting a consensual interview obviates the requirement of reasonable suspicion, but we do think it is a factor to be considered in weighing the government's interest.

-22-

faces a stark choice. As the Boyea court noted, he can intercept the vehicle immediately and ascertain whether its driver is operating under the influence of drugs or alcohol. 765 A.2d at 862. Or he can follow and observe, with three possible outcomes: the suspect drives without incident for several miles; the suspect drifts harmlessly onto the shoulder, providing corroboration of the tip and probable cause for an arrest; or the suspect veers into oncoming traffic, or fails to stop at a light, or otherwise causes a sudden and potentially devastating accident. Id. In contradistinction to J.L., where the suspect was merely standing at the bus stop, in this context the suspect is extremely mobile, and potentially highly dangerous. See Boyea, 765 A.2d at 867 ("[A] drunk driver is not at all unlike a 'bomb,' and a mobile one at that."). Thus, we think that there is a substantial government interest in effecting a stop as quickly as possible.[13]

That interest must be balanced against the individual's right to remain free from unreasonable government intrusion. See Terry, 392 U.S. at 20-21. We readily acknowledge that citizens have a liberty interest in proceeding unmolested along public highways and that investigatory stops create a substantial intrusion on that interest. See Delaware v. Prouse, 440 U.S. 648, 657 (1979) (noting that vehicular stops interfere with freedom of movement, are inconvenient, consume time, and may create substantial anxiety). At the same time, we think that such stops are considerably less invasive, both physically and psychologically, than the frisk on a public corner that was at issue in J.L.. See Boyea, 765 A.2d at 868 (reasoning that the liberty interest implicated by a vehicular stop is weaker than

---

[13] Consequently, when the officer does not effect an immediate stop of a potentially drunk driver, the force of this justification rapidly diminishes. See, e.g., McChesney, 988 P.2d at 1075-78 (finding no reasonable suspicion where officer did not personally witness erratic driving after trailing vehicle a substantial distance); Boyle, 793 So.2d at 1282-85 (Terry stop not justified where police caught up with suspect in his own driveway); Washington v. State, 740 N.E.2d at 1243-46 (finding no reasonable suspicion where officer had not personally observed any dangerous driving during the two miles he followed the car).

the "hands-on violation of the person" of the public frisk in <u>J.L.</u>); <u>Walshire</u>, 634 N.W.2d at 630. Recognizing the "magnitude of the drunken driving problem," the Supreme Court has approved the use by law enforcement of brief roadside sobriety checkpoints. <u>See</u> <u>Michigan Dep't of State Police v. Sitz</u>, 496 U.S. 444, 451 (1990). We rather doubt that a like recognition of the dangers of illegal handguns would lead the Court to approve a scheme of randomly placed magnetometers ("metal detectors") on public sidewalks, even in high-crime neighborhoods.

After careful consideration of all of the above factors, we find that the initial stop of the vehicle in which Wheat was a passenger was not unreasonable under the totality of the circumstances. An anonymous caller provided an extensive description of a vehicle that, based on his contemporaneous eyewitness observations, he believed was being operated dangerously, and cited specific examples of moving violations. When Officer Samuelson caught up with the vehicle minutes later while it was stopped at an intersection, he corroborated all its innocent details, confirming that it was the one identified by the tipster. Within seconds after the vehicle resumed motion, Officer Samuelson effected an immediate investigatory stop, rather than allow it to proceed and potentially endanger other vehicles. Under the totality of the circumstances, he had reasonable suspicion to do so, and the stop was valid under the Fourth and Fourteenth Amendments.

2.     On Plain Error Review, Wheat Cannot Show That He Was Unreasonably Detained After Officer Samuelson Discovered That the Suspension Did Not Need to Be Served

Wheat also claims that "after Samuelson discovered that no DOT suspension needed to be served, Wheat should have been allowed to leave the scene immediately." Wheat's Brief, at 16. However, Wheat failed to make this argument before the district court. <u>See</u> <u>infra</u>. Reviewing it now for plain error, <u>see</u>

-24-

Fed. R. Crim. Pro. 52(b); <u>Johnson v. United States</u>, 520 U.S. 461, 465-66 (1997), we find it to be without merit. As the district court discussed in a footnote:

> Defendant Wheat does not contend that he was unreasonably detained <u>after</u> Officer Samuelson learned that he did not have to serve a license suspension on him. Nor would such an argument have any merit. Immediately after learning that he did not have to serve the license suspension on Wheat, Officer Samuelson and Officer Anderson left Samuelson's patrol car, returned Wheat's license[,] and informed him that he did not need to be served with the license suspension. Immediately after informing Wheat of these events, Officer Samuelson turned to McDonald and requested consent to search the Nissan.

Gov't App., at 51, Order Adopting Report and Recommendation, at 19 n.7 (emphasis in original).

We must accept these findings of historical fact except upon a showing that they are clearly erroneous, <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996), and Wheat has offered no evidence to that end. Moreover, we agree with the district court's legal conclusions. "After making a valid <u>Terry</u> stop, police officers must diligently work to confirm or dispel their suspicions in a short period of time." <u>United States v. Bell</u>, 183 F.3d 746, 749 (8th Cir. 1999). In this case, Officer Samuelson worked diligently to ascertain whether or not the license suspension needed to be served; after learning that it did not, he immediately informed Wheat of that fact. At most, there occurred a momentary conference between Officer Samuelson and Officer Anderson about the latter's previous encounters with the driver. The district court did not err, let alone commit plain error, by denying Wheat's motion to suppress.

**B.     The Apprendi Error Was Harmless**

Wheat next claims that his sentence of 110 months is unconstitutional in light of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. We have consistently extended this holding to federal drug cases applying 21 U.S.C. § 841 (1994), the statute criminalizing possession with intent to distribute controlled substances. See, e.g., United States v. Aguayo-Delgado, 220 F.3d 926, 932-33 (8th Cir. 2000), cert. denied, 531 U.S. 1026 (2000); United States v. Sheppard, 219 F.3d 766, 767 (8th Cir. 2000), cert. denied, 531 U.S. 1200 (2001).

Wheat's indictment charged him with possession with intent to distribute more than 50 grams of cocaine base under §§ 841(a)(1) and (b)(1)(A), but the jury acquitted him of that charge and convicted him of the lesser included offense of simple possession of cocaine base under 21 U.S.C. § 844(a) (1994) instead. Although this is the first time we have had to consider the application of Apprendi to § 844, the task is functionally no different than with respect to § 841. A conviction of simple possession of a controlled substance under § 844 may be punished by a term of imprisonment not to exceed one year, or two years if the individual, like Wheat, has previously been convicted of any drug offense under any state law or under Chapter 13 of Title 21 of the United States Code. 21 U.S.C. § 844(a). However, § 844 also provides special enhanced penalties where the controlled substance in question is cocaine base and certain specified quantities are possessed, depending on the existence and number of prior convictions under § 844(a). See id. For individuals such as Wheat who have no prior convictions under § 844(a), the statute provides that possession of cocaine base in an amount exceeding five grams is punishable by a term of imprisonment not less than five

years and not more than twenty years.  See id.  Wheat argues that because the jury was not instructed to make a finding with respect to drug quantity, his sentence of 110 months considerably exceeds the two year maximum permitted under § 844(a) where no quantity of cocaine base is determined.

Although Apprendi was handed down after Wheat's conviction and sentencing, because his case is on direct appeal, we must apply it retroactively.  United States v. Anderson, 236 F.3d 427, 429 (8th Cir. 2001) (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1987)), cert. denied, 122 S. Ct. 356 (2001).  However, because Wheat "agreed that the quantity of [cocaine base] that he was alleged to possess was [63.03 grams], and did not object to the admission of such evidence at trial or to the court's imposing a sentence based upon its own finding of quantity, our review is for plain error."  United States v. Poulack, 236 F.3d 932, 937 (8th Cir. 2001), cert. denied, 122 S. Ct. 148 (2001).  Under that standard,

> before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

Johnson v. United States, 520 U.S. 461, 466-67 (1997) (citations, brackets, and internal quotation marks omitted); see also Fed. R. Crim. Pro. 52(b).

We begin our analysis by assuming, as the government concedes, that plain error has occurred.[14]  Wheat was properly charged with a specific quantity of drugs

_____

[14]    We note, however, that in a case presenting nearly identical factual circumstances, the Fourth Circuit held that no Apprendi error whatsoever had occurred, reasoning that the jury had made a quantity finding.  In United States v. Brooks, 7 Fed. Appx. 248, 252 (4th Cir. 2001) (per curiam), cert. denied, 122 S. Ct.

in the indictment. However, the jury was apparently not instructed to consider the quantity charged as an element of the offense,[15] and the relevant quantity was therefore determined only at sentencing. Because failure to submit the element of quantity to the jury would be error today, it was error then, and the first prong of plain error review is satisfied. See Johnson, 520 U.S. at 467. The second element of the test is likewise met. "[I]n a case such as this--where the law at the time of trial was settled and clearly contrary to the law at the time of appeal--it is enough that an error be 'plain' at the time of appellate consideration." Id. at 468.

---

261 (2001), the court considered the appeal of an individual arrested while in possession of 13.11 grams of crack and, like Wheat, indicted under § 841(b)(1)(A), but convicted only of the lessor included offense under § 844(a). The appellant was charged in his indictment with possession with intent to distribute more than five grams of crack. Id. Because jurors were instructed that to convict him of the lesser included offense they had to find beyond a reasonable doubt that he had "possessed the controlled substance described in the indictment," the court held that the instruction required the jury to find beyond a reasonable doubt that the appellant possessed more than five grams. Id. Therefore, the jury had effectively made a specific finding on the element of quantity, and the conviction accordingly satisfied Apprendi. Id.

   In the instant case, Wheat's indictment charged him with possession with intent to distribute more than 50 grams, and the jury instruction with respect to the lesser included offense was identical to the one in Brooks--i.e., the jury had to find that Wheat had "intentionally possessed the controlled substance described in the indictment." Gov't App., at 82, Final Instruction No. 18--Lesser Included Offense. Brooks is therefore directly on point. However, expressing neither approval nor disapproval, we decline to follow it at this time, as the law of our own circuit provides sufficient grounds on which to affirm Wheat's conviction.

   [15] The verdict form is simple, not special. The record on appeal does not include a copy of Jury Instruction No. 17, Elements of the Offense. However, the government has conceded that the jury did not make a particular finding with respect to quantity.

-28-

The government argues that Wheat cannot pass the third and fourth prongs of the clear error test. It relies on decisions of other circuits, e.g., United States v. Swatzie, 228 F.3d 1278 (11th Cir. 2000), cert. denied, 121 S. Ct. 2600 (2001), as well as our own decision in Anderson, 236 F.3d 427, decided under the closely related harmless error standard, wherein Apprendi errors have been held harmless where overwhelming evidence of the quantity was adduced at trial, such that no rational jury could have reached a verdict of conviction and yet not found that quantity of drugs had it been charged to do so. Because the only drugs at issue in this case were the 63.03 grams of cocaine base found in the McDonald's bag, and because Wheat did not contest that quantity of drugs at trial, see Trial Tr., at 64-69, and repeatedly conceded its accuracy at the sentencing hearing,[16] no rational jury could have convicted him of possession of cocaine base except by reference to the 63.03 grams of cocaine base. See Anderson, 236 F.3d at 430.

At oral argument, Wheat pursued a novel line of argument. Returning to a theme he had adopted at the sentencing hearing, he argued that the Apprendi error cannot be held harmless precisely because the jury that tried him was not rational. Specifically, Wheat argues that 63.03 grams can only be considered to be a distribution-level quantity of cocaine base, yet the jury expressly declined to convict him of possession with intent. It therefore acted irrationally, and the verdict arrived at could only be a compromise or a form of nullification. In these circumstances, Wheat argues, the court simply cannot presume to state what the jury would have done had it been instructed to consider quantity as an element of the offense.

We cannot accept this admittedly creative argument for two reasons. First, we do not think that the jury verdict was irrational. In order to prove a violation of

---

[16] See, e.g., Sentencing Tr., at 5 (responding affirmatively to court's question that quantity was 63 grams), 28 ("There's no doubt that it was 63 grams.").

§ 841(a), the government had to prove that Wheat had the specific intent to distribute the cocaine base. United States v. Franklin, 728 F.2d 994, 998 (1984). Although intent to distribute may be inferred solely from possession of a large quantity of a controlled substance, id.; United States v. Gonzalez-Rodriguez, 239 F.3d 948, 951 (8th Cir. 2001), the government always bears the burden of proof on this issue. Gonzalez-Rodriguez, 239 F.3d at 951. In Franklin, we reversed a conviction for possession with intent to distribute where the defendant did not dispute that he knowingly and intentionally possessed 35 grams of 42 percent pure cocaine at the time of his arrest. 728 F.2d at 998. We held that as a matter of law, because the cocaine was not packaged in a manner consistent with distribution, and the government offered no evidence of distribution paraphernalia, amounts of cash, weapons, or other indicia of distribution, the evidence of mere possession of 35 grams was insufficient to support an inference of possession with intent to distribute. Id. at 1000. We therefore remanded with instructions to enter a judgment for simple possession under § 844(a). Id. at 1000-01.

We have scrutinized the trial transcript in the instant case and have found the government's evidence on the issue of intent to distribute to be underwhelming. The only extrinsic evidence the government produced was that Wheat was in possession of $250 in cash at the time of his arrest. See Trial Tr., at 29. On cross-examination of the government's witnesses, Wheat's counsel emphasized the point that no drug notes or drug paraphernalia were seized. See id., at 38-39, 51. Nor, as Wheat's counsel observed out of the hearing of the jury, did the government's witnesses testify that the amount of cocaine seized was a quantity typically associated with distribution. See id., at 81. The evidence presented showed only that Wheat possessed four large chunks of cocaine base, not packaged in distribution-level quantities. Although the jury could have inferred that 63.03 grams is a quantity sufficiently large that Wheat intended to distribute it, we can hardly aver that it was irrational not to have done so. Indeed, Wheat's jury is not unique in acquitting under § 841(a) but convicting under §

844(a) where the quantity would have supported a determination either way. See, e.g., Brooks, 7 Fed. Appx. at 249-52 (13.11 grams of crack).

Moreover, even if we suspected that the jury had reached a compromise verdict, the Supreme Court does not direct us to try to go into the mind of the jury to glean evidence of irrational jury behavior. In Neder, the Court framed the question for the reviewing court thus: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" 527 U.S. at 18 (emphasis added). Indeed, guessing about the jury's rationale is precisely what courts must not do. We must accept the verdict that the jury handed down, which was a conviction on the count of simple possession of cocaine base, and the only evidence of cocaine base in this case was the 63.03 grams in the McDonald's bag. Wheat never contested the accuracy of the quantity measurement at trial, and repeatedly conceded its accuracy at sentencing. As no rational jury could have convicted Wheat of possession of cocaine base yet found him responsible for less than five grams, any Apprendi error did not affect Wheat's substantial rights; nor did it seriously affect the fairness, integrity, or public reputation of his trial. See Poulack, 236 F.3d at 937-38 (holding that defendant's substantial rights were unaffected where quantity was charged in the indictment, the defendant stipulated to quantity at trial, and defendant's counsel conceded accuracy of court's determination of quantity at sentencing); United States v. Nelson, 9 Fed. Appx. 583, 584 (8th Cir. 2001); but cf. United States v. Frazier, -- F.3d --, 2001 WL 1359243, at *14 (8th Cir. Nov. 6, 2001) (holding that although defendants' substantial rights were affected, "[b]ecause the evidence overwhelmingly establishes a quantity of drug sufficient to authorize the sentences imposed, we conclude the jury's failure to find the amount of heroin did not seriously affect the fairness, integrity, or public reputation of the proceedings"); United States v. Soltero-Corona, 258 F.3d 858, 860 (8th Cir. 2001).

## III.   CONCLUSION

The district court properly denied Wheat's motion to suppress, and any
<u>Apprendi</u> error is harmless.  We have considered Wheat's remaining arguments
and find them to be without merit.  The judgment of conviction is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.